## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Case No. |
| PACIFIC ETHANOL HOLDING CO. LLC, et al., | Chapter 11 Joint Administration Pending |
| Debtors.[1] | |

**DEBTORS' MOTION FOR ENTRY OF ORDERS (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION SENIOR SECURED SUPER-PRIORITY FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(c), 363(e), 364(c), 364(d)(1), 364(e) AND 507, (B) UTILIZE CASH COLLATERAL OF CERTAIN PREPETITION LENDERS, (II) GRANTING ADEQUATE PROTECTION TO CERTAIN PREPETITION LENDERS PURSUANT TO 11 U.S.C. §§ 361, 362, 363 AND 364, AND (III) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001(b) AND 4001(c), AND (IV) GRANTING RELATED RELIEF**

The debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors") hereby move (this "Motion") pursuant to sections 105, 361, 362, 363(c), 363(e), 364(c), 364(d)(1), 364(e) and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended (the "Bankruptcy Code") and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for the entry of the proposed interim order (the "Interim Order")[2] and the proposed final order (the "Final Order" and, together with the Interim Order, the "DIP Orders") (I) authorizing the Debtors to (A) obtain postpetition financing (the "DIP Facility") consisting of: (a) a super-priority non-amortizing revolving credit facility (the

---

[1] The Debtors consist of: Pacific Ethanol Holding Co. LLC (EIN: XX-XXX6981); Pacific Ethanol Madera LLC (EIN: XX-XXX3339); Pacific Ethanol Columbia, LLC (EIN: XX-XXX9392); Pacific Ethanol Stockton LLC (EIN: XX-XXX8349); Pacific Ethanol Magic Valley, LLC (EIN: XX-XXX7391). Pacific Ethanol Holding Co. LLC is the sole member of each of the other Debtors. The mailing address for Pacific Ethanol Holding Co. LLC is 400 Capitol Mall, Suite 2060, Sacramento, CA 95814.

[2] Certain of the principal parties in these cases have been reviewing the form of Interim Order and have made and may make further comments. To the extent there is any difference between the proposed Interim Order filed herewith and any Interim Order submitted to the Court for approval, the Debtors will submit a marked version of the attached Interim Order and highlight any changes for the Court.

"DIP Revolving Loans") in an aggregate principal amount not to exceed $20 million (the "DIP Revolving Commitment"), of which up to $10 million shall be available upon entry of the Interim Order (the "DIP Revolving Interim Commitment"), and (b) a 1.50:1.00 dollar conversion (calculated on the basis of a one and one-half dollar of DIP Roll Up Loans (as defined below) for each dollar of DIP Revolving Loans provided by the DIP Lenders (as defined below) in an amount not to exceed $30 million, of which up to $15 million shall convert concurrently with the funding of the DIP Revolving Interim Commitment upon entry of the Interim Order, with respect to the pro rata outstanding Prepetition Indebtedness (as defined below) beneficially owned by the applicable DIP Lenders, and (B) use the cash collateral (as such term is defined in section 363(a) of the Bankruptcy Code, the "Cash Collateral") of WestLB AG, New York Branch ("WestLB") and the syndicate lenders (collectively with WestLB, the "Prepetition Lenders") party to the Prepetition Credit Agreement (defined below), (II) granting adequate protection to certain of the Prepetition Lenders, (III) prescribing the form and manner of notice and setting the time for the final hearing on the Motion (the "Final Hearing"), and (IV) granting related relief. In support of this Motion, the Debtors rely upon, and incorporate by reference herein, the Declaration of Christopher W. Wright in Support of First Day Pleadings (the "Wright Declaration") and the Declaration of Thomas E. Lumsden in Support of this Motion (the "Lumsden Declaration"), each filed concurrently herewith. In further support of the Motion, the Debtors, by and through their undersigned counsel, respectfully represent:

### Bankruptcy Rule 4001 Concise Statement[3]

1.      Pending the Final Hearing, the financing, use of Cash Collateral, grant of adequate protection and other related relief will be implemented on an interim basis pursuant to the

---

[3]      All capitalized terms used herein but not otherwise defined, shall have the meanings ascribed to them in the DIP Credit Agreement (as defined below) or the Interim Order, as applicable.

terms of the proposed Interim Order and the credit agreement governing the terms and conditions of the DIP Facility (the "DIP Credit Agreement"), true and correct copies of which are annexed hereto as Exhibit A and Exhibit B, respectively.

2.  Material provisions of the DIP Facility are set out in the following sections of the DIP Credit Agreement and/or the proposed Interim Order:[4]

(a)  Borrowers. Pacific Ethanol Holding Co. LLC ("PE HoldCo"), Pacific Ethanol Madera LLC ("PE Madera"), Pacific Ethanol Columbia, LLC ("PE Columbia"), Pacific Ethanol Stockton, LLC ("PE Stockton") and Pacific Ethanol Magic Valley, LLC ("PE Magic Valley").

(b)  Borrowings. The DIP Facility shall include: (x) revolving loans to be advanced and made available to the Borrowers in the aggregate maximum principal amount of $20 million and (y) a 1:50:1.00 conversion of an amount not to exceed $30 million (the "DIP Roll-Up Amount" and together with the DIP Revolving Commitment, the "DIP Commitments") with respect to the pro rata outstanding Prepetition Indebtedness beneficially owned by the applicable DIP Lenders (or affiliates thereof) at the Closing Date (the "DIP Roll-Up Loans"). The DIP Roll-Up Amount will be calculated on a basis of one and one-half dollars of DIP Roll-Up Loans for each dollar of DIP Revolving Loans provided by the DIP Lenders.

The DIP Revolving Interim Commitment shall be made available during the period from the date of entry of the Interim Order through the date of entry of the Final Order approving the DIP Facility and the balance of which DIP Revolving Commitment shall be available after entry of the Final Order.

Approximately $15 million of DIP Roll-Up Loans shall convert concurrently with the funding of the DIP Revolving Interim Commitment.

DIP Credit Agreement Sections 2.01, 2.02; Interim Order ¶ 1.

---

[4]  The summaries and descriptions of the terms and conditions of the DIP Credit Agreement and Interim Order set forth in this Motion are intended solely for informational purposes to provide the Court and parties in interest with an overview of the significant terms thereof and should only be relied upon as such. The summaries and descriptions are qualified in their entirety by the DIP Credit Agreement and Interim Order. In the event there is a conflict between this Motion and the DIP Credit Agreement or Interim Order, the DIP Credit Agreement or Interim Order, as applicable, shall control in all respects.

(c)    <u>DIP Lender(s)</u>. WestLB and together with any person who shall become a lender under the DIP Facility (collectively with WestLB, the "<u>DIP Lenders</u>").

(d)    <u>DIP Agent</u>. WestLB, in such capacity as DIP agent (the "<u>DIP Agent</u>").

(e)    <u>Operating Budget</u>. There shall be an operating budget, subject to the approval of the DIP Agent and the DIP Lenders, consisting of the Borrowers' estimated projected cash flow position on a rolling 13-week basis (the "<u>DIP Budget</u>"), commencing as of the Closing Date. Upon approval of DIP Agent and the DIP Lenders of the DIP Budget, any subsequent changes to the DIP Budget may be made only on approval of the DIP Agent and DIP Lenders holding a majority of the outstanding DIP Revolving Loans and DIP Commitments. The Borrowers will be allowed a 10% variance on the aggregate amounts set forth in the DIP Budget. The DIP Budget shall include monthly reimbursement of the reasonable fees and expenses of the professionals of DIP Agent and DIP Lenders and the Prepetition Agent.

DIP Credit Agreement Sections 7.01(g) and (*l*); Interim Order ¶ D.

(f)    <u>Special Provision for DIP Roll-Up Loans</u>. The DIP Roll-Up Loans may not be required to be repaid in cash on the Maturity Date. Any repayment of a DIP Revolving Loan will not reduce the amount of outstanding DIP Roll-Up Loans. Upon the vote of the Roll-Up Loan class to accept a Chapter 11 Plan in accordance with Section 1126 of the Bankruptcy Code, the Borrowers' plan of reorganization may require that the DIP Roll-Up Loans be refinanced or otherwise replaced with other securities or financial instruments with a present value equal to the accrued principal and interest due in respect of the DIP Roll-Up Loans as of the effective date of the plan; <u>provided</u> that the relative lien position of the DIP Lenders under the DIP Revolving Loans in respect of the DIP Roll-Up Loans is maintained, and <u>provided</u>, <u>further</u>, that the relative lien position of the DIP Lenders under the DIP Roll-Up Loans in respect of the outstanding obligations under the Prepetition Credit Agreement (the "<u>Prepetition Indebtedness</u>") is maintained. Upon conversion of the DIP Roll-Up Loans in connection with the funding of the DIP Revolving Loans, the DIP Roll-Up Loans shall cease to be indebtedness under the Prepetition Credit Agreement and shall be deemed DIP Obligations in all respects including for purposes of having the benefit of Section 364(e) of the Bankruptcy Code.

The Interim Order and the Final Order shall contain provisions prohibiting the Borrowers from incurring any indebtedness which (x) ranks *pari passu* with or senior to the loans under the DIP Facility or (y) benefits from a first or second priority lien under section 364 of the Bankruptcy Code.

DIP Credit Agreement Sections 3.01, 3.02(b); Interim Order ¶¶ 20, 24.

(g) Mandatory Prepayments. The Borrowers will be required to prepay certain amounts under the DIP Facility upon receipt of (i) Project Document Termination Payments; (ii) Condemnation Proceeds; (iii) Insurance Proceeds; and (iv) Net Cash Proceeds of any Disposition. Unless agreed to otherwise by the DIP Lenders, prepayments of principal outstanding under the DIP Facility shall permanently reduce the DIP Commitments.

Mandatory prepayments shall be applied, first, to the payment of all costs, fees, expenses and indemnities then due and payable to the DIP Lenders (including attorney's and professional's fees); second, to the payment of any accrued and unpaid interest due and payable on the DIP Revolving Loans *pro rata* among the DIP Lenders (other than any DIP Lender that has defaulted on its obligations to advance DIP Revolving Loans (a "Defaulting Lender")) with respect to their respective outstanding principal amounts; third, to the repayment of principal of DIP Revolving Loans (and permanent reduction of the Revolving Commitments associated therewith) *pro rata* among the DIP Lenders (other than the Defaulting Lenders) with respect to their respective outstanding principal amounts until repaid in full; fourth, to the payment of all accrued and unpaid interest then due and payable on the DIP Revolving Loans *pro rata* among the Defaulting Lenders based on their respective outstanding principal amounts on the date of such prepayment; fifth, to the payment of principal of DIP Revolving Loans *pro rata* among the Defaulting Lenders based on their respective outstanding principal amounts on the date of such prepayment; sixth, to the payment of all accrued and unpaid interest due and payable on the DIP Roll-Up Loans pro rata among the DIP Lenders (other than the Defaulting Lenders); seventh, to the payment of the principal of the DIP Roll-Up Loans *pro rata* among the DIP Lenders (other than the Defaulting Lenders) based on their respective outstanding principal amounts on the date of such prepayment and a corresponding reduction in the DIP Roll-Up Loan Commitment; eighth, to the payment of all accrued and unpaid interest then due and payable on the DIP Roll-Up Loans *pro rata* among the Defaulting Lenders based on their respective outstanding principal amounts on the date of such prepayment; and ninth, to the payment of principal of the DIP Roll-Up Loans *pro rata* among the Defaulting Lenders based on their respective outstanding principal amounts on the date of such prepayment.

DIP Credit Agreement Section 3.08.

(h) Interest Rate and Default Rate. Interest shall be payable monthly in arrears in cash on the outstanding amount of the DIP Revolving Loans on the first business day of each month at a rate equal to LIBOR + 10 % per annum. LIBOR shall be defined as the greater of (i) 4% per annum and

(ii) the offered rate on the applicable page of the Telerate screen (or any successor thereto) that displays an average British Bankers Association Interest Rate Settlement Rate for deposits in U.S. Dollars and shall contain appropriate protection to ensure that such rate is not less than a DIP Lender's cost of funds.

Interest on the DIP Roll-Up Loans shall accrue interest at the predefault rate applicable to the base rate term loans under the Prepetition Credit Agreement.

The default rate will be the then applicable interest rate plus 2.0% per annum.

DIP Credit Agreement Sections 3.02, 3.03 and 3.04; Interim Order ¶ 5.

(i) <u>Maturity</u>. The Borrowers shall repay any outstanding advances and loans under the DIP Facility (other than the DIP Roll-Up Loans) in full in immediately available funds on the Maturity Date, to be defined as the earliest of (i) six (6) months after the Closing Date; (ii) the acceleration of all or any portion of the obligations under the DIP Facility; (iii) the first business day on which the Interim Order expires by its terms or is terminated, unless the Final Order shall have been entered and become effective prior thereto; (iv) conversion of any of the Chapter 11 Cases (defined below) to a case under Chapter 7 of the Bankruptcy Code unless otherwise consented to in writing by the DIP Agent and the DIP Lenders; (v) dismissal of any of the Chapter 11 Cases unless otherwise consented to in writing by the DIP Agent and the DIP Lenders; and (vi) the effective date of any Borrower's plan of reorganization confirmed in the Chapter 11 Cases.

DIP Credit Agreement Sections 2.06, 2.10, definition of "Maturity Date".

(j) <u>Events of Default</u>. The DIP Facility includes Events of Default customary for DIP loan transactions and investments of a similar size and nature, including, but not limited to:

- The use of proceeds inconsistent with the DIP Budget;

- The payment of claims existing prior to the Petition Date or prior to a confirmed plan of reorganization (other than as set forth in the DIP Budget or payment is approved by the DIP Agent and authorized by an Order of the Court);

- The Asset Management Agreement shall be terminated because of a breach by Pacific Ethanol, Inc. ("<u>PEI</u>");

- Dismissal or conversion to Chapter 7 of any of the Chapter 11 Cases without the written consent of the DIP Agent and the DIP

Lenders or the appointment of a trustee or examiner in any of the Chapter 11 Cases with any powers to operate or manage the financial affairs of any Borrower;

- The entry of a final order that, in the sole determination of the DIP Agent and the DIP Lenders, in any way modifies, stays, reverses, or vacates the DIP Orders or the DIP Facility in each case in a manner adverse to the DIP Agent and the DIP Lenders without the written consent of DIP Agent and the DIP Lenders or either of the DIP Orders or the DIP Facility ceases to be in full force and effect;

- The entry of the Interim Order shall not have occurred within 10 days after the Petition Date;

- The entry of the Final Order shall not have occurred within 45 days after the date of entry of the Interim Order;

- Any Borrower petitions the Bankruptcy Court to obtain additional financing *pari passu* or senior to the DIP Facility;

- The entry of an order granting any other super-priority claim or lien equal or superior to that granted to the DIP Agent or the DIP Lenders on the assets of the Borrowers;

- The entry of an order granting relief from the automatic stay so as to allow a third party to proceed against any material assets of the Borrowers;

- The entry of any order of the Bankruptcy Court confirming any plan of reorganization that does not contain a provision for termination of the DIP Facility and repayment in full in cash of all of the DIP Obligations (defined below) under the DIP Facility on or before the effective date of such plan;

- Any Borrower violates or breaches any DIP Order or files any pleadings seeking, joining in, or otherwise consenting to any violation or breach of any DIP Order in each case in a manner adverse to the DIP Agent and the DIP Lenders in the sole determination of the DIP Agent and the DIP Lenders;

- (A) The Borrowers engage in or support any challenge to the validity, perfection, priority, extent or enforceability of the DIP Facility or the Prepetition Obligations or the liens on or security interests in the assets of the Borrowers securing the DIP Facility or the Prepetition Obligations, including without limitation seeking to equitably subordinate or avoid the liens securing the Prepetition Obligations, or (B) the Borrowers engage in or support any

investigation or their assertion of any claims or causes of action (or supporting the assertion of the same) against the DIP Agent, the DIP Lenders, the Prepetition Agent or the Prepetition Lenders; provided, however, it shall not constitute an Event of Default if the Borrowers provide basic loan information with respect to the Prepetition Obligations to a party in interest or is compelled to provide information by an Order of the Bankruptcy Court and provides prior written notice to the DIP Agent and the DIP Lenders of the intention or requirement to do so;

- Any person shall seek a determination under Section 506(a) of the Bankruptcy Code (a "Section 506(a) Determination") with respect to the Prepetition Obligations that is unacceptable to the Prepetition Agent and the Prepetition Lenders;

- The allowance of any claim or claims under Section 506(c) or 552(b) of the Bankruptcy Code against or with respect to any of the collateral securing the DIP Facility;

- The entry of an order extending any exclusive right that any of the Borrowers may have to propose a plan that is more than 120 days after the Petition Date, or to solicit votes or to seek confirmation of plan on a date more than 180 days after the Petition Date, in either case without the written consent of the DIP Agent and the DIP Lenders;

- The use of cash collateral other than as expressly contemplated by the DIP Orders and the DIP Budget prior to the indefeasible payment in full of the DIP Obligations and termination of the DIP Commitments thereunder;

- The consummation of the sale of any material portion of the Borrowers' assets unless consented to by the DIP Agent and the DIP Lenders; and

- Breach of any covenants or representations and warranties in the DIP financing documents or the DIP Orders, including without limitation, failure to make any Mandatory Prepayments.

DIP Credit Agreement Section 9.01.

(k)    Liens. To secure all obligations of the Borrowers under and with respect to the DIP Facility (the "DIP Obligations"), DIP Agent, for the benefit of the DIP Lenders, shall receive, pursuant to Sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code, the DIP Orders and the definitive DIP Facility loan documents, valid, enforceable, and fully perfected security interests in and liens upon all prepetition and postpetition assets

of the Borrowers, whether now existing or hereafter acquired or arising (collectively, the "DIP Collateral"), which liens shall have the priority set forth below. DIP Collateral shall include all rights, claims and other causes of action of each Borrower's estate and any other avoidance actions under Chapter 5 of the Bankruptcy Code and the proceeds thereof and property received thereby whether by judgment, settlement or otherwise (collectively, "Avoidance Actions").

Liens and security interests with respect to DIP Collateral (the "DIP Liens") shall not be subject to challenge and shall attach and become valid and perfected upon entry of the Interim Order without the requirement of any further action by DIP Agent or DIP Lenders. DIP Collateral will be free and clear of other liens, claims and encumbrances, except valid, perfected, enforceable and unavoidable liens in existence as of the petition date, if any, and any other Permitted Liens (as defined in the Prepetition Credit Agreement).

The DIP Liens granted to the DIP Lenders with respect to the DIP Roll-Up Loans will be *pari passu* (on a pro rata basis) to the liens granted to the DIP Lenders with respect to the DIP Revolving Loans.

The DIP Obligations will enjoy super-priority administrative expense status under Section 364(c)(1) with priority over all other costs and expenses of the kinds specified in, or ordered pursuant to, Sections 105, 326, 330, 328, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113, 1114 or any other provisions of the Bankruptcy Code, subject to the Carve-Out.

As used in the DIP Credit Agreement, the term "Carve-Out" shall mean the sum of (i) the aggregate amount of any budgeted, accrued but unpaid, professional fees and expenses existing as of the Carve-Out Date (as defined below) of the Borrowers and of the Committee, which fees and expenses are approved by the Bankruptcy Court and in compliance with the DIP Budget, plus (ii) those professional fees and expenses of the Borrowers and the Committee incurred after the Carve-Out Date and subsequently allowed by the Bankruptcy Court and in compliance with the DIP Budget in an amount not to exceed $250,000 in the aggregate, plus (iii) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930. Prior to the Carve-Out Date, subject to entry of an appropriate order of the Bankruptcy Court (in form and substance acceptable to the DIP Agent and the DIP Lenders), the Borrowers shall be permitted to use Advances under the DIP Facility to pay compensation and reimbursement of expenses allowed and payable under sections 330 and 331 of the Bankruptcy Code in accordance with the DIP Budget, and the Carve-Out shall not be reduced by the amount of any compensation and reimbursement of expenses paid or incurred (to the extent ultimately allowed by the Bankruptcy Court) prior to the occurrence of the Carve-

Out Date; provided, further, that following the Carve-Out Date, any amounts paid to professionals by any means will reduce the Carve-Out on a dollar-for-dollar basis; and provided, further, that nothing in the DIP Credit Agreement shall be construed to impair the ability of any party to object to any of the fees, expenses, reimbursement, or compensation sought by the professionals retained by the Borrowers or any statutory committee in the Chapter 11 Cases.

"Carve-Out Date" means the date that is the earlier of any Borrower's receipt of a notice of default under the DIP Facility or the Maturity Date.

Neither the Advances under the DIP Facility nor the Carve-Out may be used to challenge the amount, validity, perfection, priority or enforceability of, or assert any defense, counterclaim or offset to the DIP Facility or the Prepetition Credit Agreement, or the security interests and liens securing the DIP Obligations or the Prepetition Obligations with respect thereto or otherwise to litigate against the DIP Agent, the DIP Lenders, the Prepetition Agent or the Prepetition Lenders; provided, however, the foregoing shall not apply to any Advances or Carve-Out that are used for purposes of seeking a Section 506(a) Determination. Notwithstanding the foregoing, the Committee may spend up to an aggregate maximum of [$15,000] under the DIP Facility and the Carve-Out to investigate potential claims arising out of, or in connection with, the Prepetition Credit Agreement or the security interests and liens securing the Prepetition Obligations.

DIP Credit Agreement Sections 2.09, 2.11, 5.13, 7.01(g)(ii) – (iv), definitions of Carve-Out, Carve-Out Date and Collateral, and Schedule 6.01(n); Interim Order ¶¶ 9, 10, 11, 14.

(l)     Adequate Protection. As adequate protection to the Prepetition Lenders for any diminution in the value of their interests in the Borrowers' property resulting from (i) the priming liens granted in favor of the DIP Agent and the DIP Lenders under the DIP Facility pursuant to section 364(d)(1) of the Bankruptcy Code, (ii) the use, sale or lease of the Borrowers' property (including any Cash Collateral) pursuant to section 363(c) of the Bankruptcy Code and (iii) the imposition of the automatic stay pursuant to section 362(a) of the Bankruptcy Code:

- The Prepetition Lenders will, subject to the terms of any DIP Order, maintain any of their liens in existence on the Petition Date (the "Prepetition Liens") on the DIP Collateral, which liens shall be junior and subordinate to the DIP Liens and the Carve-Out;

- The Prepetition Agent, on behalf of the Prepetition Lenders, shall be granted replacement liens on, and security interests in, all of the DIP Collateral, which replacement liens shall be subject only to (1) the liens on, and security interests in, the DIP Collateral

granted to the DIP Agent and the DIP Lenders under the DIP Facility and the DIP Orders, as the case may be, (2) any Permitted Liens (as defined in the Prepetition Credit Agreement) and (3) the Carve-Out;

- Pursuant to Section 507(b) of the Bankruptcy Code, the Prepetition Agent, on behalf of the Prepetition Lenders, shall be granted an administrative claim with priority over all administrative expense claims and unsecured claims against the Borrowers (the "507(b) Claim"), subject only to (1) the super-priority claims granted to the DIP Agent and the DIP Lenders under the DIP Facility and the DIP Orders, as the case may be, and (2) the Carve-Out; and

- As additional adequate protection, the Borrowers shall reimburse the Prepetition Lenders on a monthly basis for the reasonable professional fees and expenses of the Prepetition Agent otherwise permitted under the Prepetition Credit Agreement arising (i) before the Petition Date and (ii) after the Petition Date to the extent such amounts arise in connection with the enforcement of the protections granted to the Prepetition Lenders pursuant to the DIP Orders; provided, however, if and to the extent that any payment(s) is challenged by a party in interest under section 506(b) of the Bankruptcy Code and ultimately not allowed under such provision, such payment(s) may be recharacterized as a payment of principal on the Prepetition Obligations.

Notwithstanding the foregoing, the Prepetition Agent and the Prepetition Lenders shall be granted adequate protection as provided herein to the extent the Prepetition Liens are valid, enforceable, perfected and non-avoidable.

Interim Order ¶¶ 12, 13.

(m) Fees. The Borrowers will pay the following fees on account of the DIP Facility:

- Facility Fee. A fee of 2.0% of the DIP Revolving Commitment payable to the DIP Lenders on the Closing Date.

- Structuring Fee. A fee of 1.0% of the DIP Revolving Commitment payable to the DIP Agent on the Closing Date.

- Unused Commitment Fee. A fee on the unused portion of the DIP Revolving Commitment of 2.0% per annum, payable monthly.

- All reasonable out-of-pocket fees, costs and expenses of the DIP Agent, the DIP Lenders, the Prepetition Agent and the Prepetition

Lenders (including, without limitation, reasonable out-of-pocket prepetition and postpetition fees, costs, expenses and disbursements of legal counsel, financial advisors and third-party appraisers, advisors and consultants advising the DIP Agent, the DIP Lenders, the Prepetition Agent and the Prepetition Lenders) to be payable by the Borrowers under the DIP Facility on demand whether or not the transactions contemplated hereby are consummated; <u>provided</u>, <u>however</u>, the Borrowers shall only be required to pay to the Prepetition Agent and the Prepetition Lenders such amounts that have accrued and are outstanding on or prior to the Petition Date, except as otherwise permitted in the Interim Order.

DIP Credit Agreement Sections 3.11, 11.07.

3.    The provisions described in Bankruptcy Rule 4001(b)(1)(B)(i)-(iv) are set forth at the following sections of the Interim Order:

(a)    *Name of Each Entity with Interest in Cash Collateral*. Interim Order pp.1-2; ¶ C.

(b)    *Purposes of Use of Cash Collateral*. Interim Order ¶ H.

(c)    *Material Terms, Including Duration, of Use of Cash Collateral*. Interim Order ¶¶ D, H.

(d)    *Liens, Cash Payments, or Other Adequate Protection to Be Provided to Each Entity with Interest in Cash Collateral*. Interim Order ¶¶ 12, 13.

4.    In addition, the provisions described in Bankruptcy Rule 4001(c)(1)(B)(i)-(xi) are set out at the following sections of the DIP Credit Agreement and the Interim Order:

(a)    *Grant of Priority or a Lien on Property of the Estate*. DIP Credit Agreement Sections 2.08; 2.11; Interim Order ¶¶ 9, 10, 11, 14.

(b)    *Adequate Protection or Priority for a Claim that Arose Before the Commencement of the Case*. Interim Order ¶ 12.

(c)    *Determination of the Validity, Enforceability, Priority, or Amount of a Claim that Arose Before the Commencement of the Case*. Interim Order ¶ C.

(d)    *Waiver or Modification of the Automatic Stay*. DIP Credit Agreement Sections 2.11(c), 9.02(a); Interim Order ¶ 23.

(e) ***Waiver or Modification of Authority to File a Plan, Seek an Extension of Time in which the Debtor has the Exclusive Right to File a Plan, Request Use of Cash Collateral, or Request Authority to Obtain Credit.*** DIP Credit Agreement Section 9.01(p)(xviii); Interim Order ¶ 20.

(f) ***Establishment of Deadlines for Filing a Plan, for Approval of a Disclosure Statement, for a Hearing on Confirmation, or for Entry of a Confirmation Order.*** N/A.

(g) ***Waiver or Modification of Applicability of Non-Bankruptcy Law Relating to the Perfection of a Lien on Property of the Estate, or on the Foreclosure or Other Enforcement of the Lien.*** DIP Credit Agreement Section 2.08(b); Interim Order ¶ 22.

(h) ***Release, Waiver, or Limitation on any Claim or Cause of Action Belonging to the Estate.*** DIP Credit Agreement Sections 2.13; Interim Order ¶¶ 10, 30.

(i) ***Indemnification of Any Entity.*** DIP Credit Agreement Sections 4.07(c), 11.09, 11.12(f); Interim Order ¶¶ 6, 18.

(j) ***Release, Waiver or Limitation on Rights under Section 506(c).*** DIP Credit Agreement Section 9.01(p)(vii); Interim Order ¶ 19.

(k) ***Liens Granted on Claims Arising Under Chapter 5.*** Interim Order ¶ 10.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

6.     On the date hereof (the "Petition Date"), PE HoldCo and 4 of its direct wholly-owned subsidiaries each commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors have requested that these chapter 11 cases (the "Chapter 11 Cases") be jointly administered.

7. No creditors' committee has been appointed in these Chapter 11 Cases by the United States Trustee. No trustee or examiner has been appointed in any of the Debtors' Chapter 11 Cases.

**The Debtors' Business**

8. The Debtors consist of four limited liability companies, each of whom owns an ethanol plant (each a "Plant LLC" and collectively, the "Plant LLCs") with current combined ethanol production capacity of over 200 million gallons per year ("MGY"), and PE HoldCo as owner/holding company for the Plant LLCs. Two of the ethanol plants are located in California, one is located in Idaho and one is located in Oregon. Due to economic and financial constraints, only the ethanol plant located in Oregon is operating at the present time. Prior to the filing of the Chapter 11 Cases, the Debtors were the production facilities for PEI, a public company, and its subsidiaries (collectively the "PEI Group"). As part of the PEI Group, the Plant LLCs were managed by PEI and the ethanol and its co-products, including wet distillers grain ("WDG"), produced at the ethanol plants were marketed and sold to customers[5] primarily in California, Nevada, Arizona, Oregon, Colorado, Idaho and Washington by PEI Group affiliates under arms-length commercial contracts as more fully described below. The ethanol plants were built at their locations as part of a destination business model, whereby each respective ethanol plant achieves lower process and transportation costs by servicing local markets for both ethanol and WDG. The ethanol plants are as follows:

- **Madera Plant**--located in Madera, California, commenced operations in October 2006 and has an annual production capacity of up to 40 MGY.

---

[5] The ethanol is sold to gasoline refining and distribution companies, while the WDG is sold to dairy farm operators and animal feed distributors for consumption by farm animals, including dairy cows and beef cattle.

- **Boardman Plant**--located in Boardman, Oregon, commenced operation in September 2007 and has an annual production capacity of up to 40 MGY.

- **Magic Valley Plant**--located in Burley, Idaho, (Magic Valley) commenced operations in April 2008 and has an annual production capacity of up to 60 MGY.

- **Stockton Plant**--located in Stockton, California, commenced operations in September 2008 and has an annual production capacity of 60 MGY.

9. As indicated above, at the present time only the Boardman Plant is in operation. The Madera, Magic Valley and Stockton Plants are in "cold shut down" with no current business operations.

**Prepetition Capital Structure**

10. As of the Petition Date, the aggregate principal amount of the Debtors' secured indebtedness was approximately $247,307,091, plus accrued and unpaid interest, fees and other costs and consisted of, among other things, construction/project financing, term loans, a revolving loan facility and a note payable (the "Prepetition Indebtedness"). Each of the Debtors are parties to that certain Credit Agreement, dated as of February 27, 2007 (as amended, restated, supplemented or otherwise modified, the "Prepetition Credit Agreement"), by and among WestLB, as administrative agent and collateral agent, and the other Prepetition Lenders (the "WestLB Facility").

11. The Prepetition Credit Agreement provides for (i) a construction loan facility in an aggregate amount of up to $247,307,692 which converted into a term loan facility comprised of two tranches: (a) Tranche A (approximately $86,187,500 in principal amount outstanding as of the Petition Date) and (b) Tranche B (approximately $141,120,192 in principal amount outstanding as of the Petition Date); (ii) a working capital facility (approximately $19,174,561

in principal amount outstanding as of the Petition Date); and (iii) letters of credit (approximately $825,439 outstanding as of the Petition Date). The primary purpose of the WestLB Facility is to provide debt financing in connection with the development, construction, installation, engineering, procurement, design, testing, start-up, operation and maintenance of the Debtors' Plants. The WestLB Facility is secured by substantially all of the assets of the Debtors, a pledge of the equity interests in each of the Debtors, and a support arrangement from PEI.

12.    On February 17, 2009, the Debtors entered into that certain Limited Waiver and Forbearance Agreement dated February 17, 2009 (the "First Waiver and Forbearance Agreement"). Among other things, the First Waiver and Forbearance Agreement permitted the Debtors to withdraw the funds otherwise required to be reserved in the Stockton Construction Account (as defined therein) and to use those funds in accordance with the Initial 13-Week Cash Flow Forecast (as defined therein). The First Waiver and Forbearance Agreement also provided that WestLB and the senior secured lenders would forbear from exercising their rights and remedies under the Prepetition Credit Agreement on the terms and conditions set forth in the First Waiver and Forbearance Agreement.

13.    On February 27, 2009, the Debtors entered into a Second Limited Waiver and Forbearance Agreement (the "Second Waiver and Forbearance Agreement"). Among other things, the Second Waiver and Forbearance Agreement provides that WestLB and the senior secured lenders will further forbear from exercising their rights and remedies under the Prepetition Credit Agreement and related documents and applicable law, on the terms and conditions set forth in the Second Waiver and Forbearance Agreement, for a period of time commencing on February 27, 2009 and ending on the earliest to occur of (i) March 31, 2009,

(ii) the date that any new default occurs under the Prepetition Credit Agreement or a default occurs under the Second Waiver and Forbearance Agreement, and (iii) the date on which all obligations have been paid in full and the Prepetition Credit Agreement has been terminated. Additionally, the Second Waiver and Forbearance Agreement provides that the Debtors will not be required to make their interest payments due and payable on February 27, 2009 until the termination of the Forbearance Period. Further, the Second Waiver and Forbearance Agreement provides that the Debtors may withdraw funds otherwise required to be maintained in a debt service reserve account and use such funds in accordance with an agreed-upon 13-week cash flow forecast.

14. On March 31, 2009, the Debtors entered into a Third Forbearance Agreement (the "Third Forbearance Agreement"). Among other things, the Third Forbearance Agreement provides that WestLB and the senior secured lenders will further forbear from exercising their rights and remedies under the Prepetition Credit Agreement and related documents and applicable law, on the terms and conditions set forth in the Third Forbearance Agreement, for a period of time commencing on March 31, 2009 and ending on the earliest to occur of (i) April 30, 2009, (ii) the date that any new default occurs under the Prepetition Credit Agreement or a default occurs under the Third Forbearance Agreement, and (iii) the date on which all obligations have been paid in full and the Prepetition Credit Agreement has been terminated.

## Intercompany Structure & Operations

15. Each of the Debtors is managed by PEI,[6] pursuant to an Asset Management Agreement entered into on May 14, 2009 (the "Management Agreement"). Under the Management Agreement, PEI is retained by each Plant LLC as an independent operator to

---

[6]     PEI owns 100% of the equity interests of Pacific Ethanol California, Inc. ("PECA"). PECA is the sole member of PE HoldCo.

operate and maintain the facility on behalf of the Plant LLC. Each Plant LLC has delegated to PEI the responsibility of maintaining and operating the facility for the production of ethanol and WDG for use or sale by each Plant LLC or one or more affiliates in the PEI Group, as more specifically described in the Management Agreement. In addition, under the Management Agreement, PEI disburses funds for the payrolls for the Plant LLCs and is reimbursed by the Plant LLCs. Under the Management Agreement, PEI also provides all management and administrative services for the Debtors.

## Kinergy Marketing LLC

16.    Each Plant LLC is a party to a written marketing agreement with Kinergy Marketing LLC ("Kinergy"),[7] whereby each Plant LLC grants Kinergy the exclusive right to market, purchase and sell the Plant LLC's ethanol. Within ten (10) days after a Plant LLC delivers ethanol to Kinergy, that Plant LLC is paid an amount equal to the (i) estimated purchase price; minus (ii) the estimated amount of transportation costs; minus (iii) the estimated amount of the applicable incentive fee (incentive fee is one percent (1%) of the aggregate purchase price). In connection with each such payment, Kinergy delivers to the Plant LLC a statement detailing its estimated calculations and within the first five business days of each calendar month the parties reconcile and "true-up" the actual purchase price, transportation costs and incentive fees for all transactions entered into since the previous payment adjustment date. The amount of such true-up is paid by the party owing such amount within five business days after the reconciliation.

---

[7]      Kinergy's sole member is PEI.

**Pacific Ag. Products, LLC**

17.    Pacific Ag. Products, LLC ("Pacific Ag"),[8] procures all of the corn feedstock for the Plant LLCs. Pacific Ag has sourced corn from over 30 loading origins in the western and central corn belt for delivery to destination ethanol facilities.  In addition to entering into purchase contracts for the corn on behalf of the Plant LLCs, Pacific Ag coordinates unit train logistics with the Plant LLCs to help ensure proper inventory levels and timely delivery. Pacific Ag earns a procurement and handling fee from PE HoldCo.

18.    Pacific Ag also markets WDG and syrup co-products from the Plant LLCs, manages all scheduling and logistics of WDG and syrup truckloads, invoices customers, and handles all credit and collections issues on behalf of the Plant LLCs.  Within ten (10) days after a Plant LLC delivers WDG and/or syrup co-products to Pacific Ag, that Plant LLC is paid an amount equal to (i) the estimated purchase price; minus (ii) the estimated amount of transportation costs; minus (iii) the estimated amount of the applicable incentive fee (the incentive fee is the greater of (x) the product of five percent (5%) multiplied by the aggregate amount of the purchase price and (y) the product of two dollars ($2.00) multiplied by each ton sold in such transaction.  In connection with each such payment, Pacific Ag delivers to the Plant LLC a statement detailing its estimated calculations and within the first five business days of each calendar month the parties reconcile and "true-up" the actual purchase price, transportation costs and incentive fees for all transactions entered into since the previous payment adjustment date.  The amount of such true-up is paid by the party owing such amount within five business days after the reconciliation.

---

[8]    Pacific Ag's sole member is PECA.

19. With the exception of the procurement and marketing fees mentioned above, substantially all of Pacific Ag's gross billings for co-products are paid out to the Plant LLCs on ten (10) day and thirty (30) day terms, respectively. Pacific Ag offers thirty (30) day terms to qualified customers and typically collects receivables from the end customer in forty (40) to forty-five (45) days.

## Events Leading to a Chapter 11 Filing

20. The Debtors' liquidity is materially affected by uncertain commodity prices for corn, natural gas and ethanol. Corn and ethanol prices have been highly volatile, do not necessarily move in the same direction (i.e., high corn prices do not necessarily result in high ethanol prices) and are impacted by a number of factors beyond the Debtors' control. Ethanol prices are generally influenced by the supply and demand for gasoline, the availability of substitutes and the effect of related laws and regulations. By contrast, corn prices are not significantly related to gasoline supply and demand; rather the availability and price of corn are subject to wide fluctuations due to unpredictable factors such as weather conditions during the corn growing season, crop yields, governmental policy with respect to agriculture and international supply and demand. Additionally, the Debtors are also impacted by other major costs including natural gas, transportation, and the purchase price of ethanol from other producers, which in turn are also highly volatile and difficult to forecast. During the latter part of 2008, the price of ethanol declined precipitously causing the Debtors' gross margins to decrease. In addition to decreasing margins, operating costs increased as a result of the construction of three additional ethanol plants in 2007 and 2008.

21. Ultimately, sizeable fluctuations in the price of corn, natural gas and ethanol, coupled with obligations to service the Debtors' debt in the face of a continued lack of liquidity

in the credit markets since 2007 and the inability to raise additional investment capital from depressed equity markets, have precipitated these Chapter 11 Cases.

## RELIEF REQUESTED

22. By this Motion, the Debtors request the authority to enter into the DIP Facility with the DIP Lenders, pursuant to the terms of this Motion, the DIP Orders, and the DIP Credit Agreement.

23. Pending entry of the Final Order, the Debtors request that the Court authorize the Borrowers, on an interim basis, to (i) borrow up to $20 million from the DIP Facility, (ii) use Cash Collateral as provided in the Interim Order, and (iii) provide adequate protection in favor of the Prepetition Lenders as described herein and in the Interim Order. Moreover, the Debtors request that the Court approve the proposed notice of the Final Hearing and the adequacy of the proposed service thereof, and schedule the Final Hearing.

### Debtors' Proposed Postpetition Financing

#### Immediate Need for Postpetition Financing

24. The Debtors lack sufficient unencumbered funds with which to operate and maintain their businesses and assets during the pendency of these Chapter 11 Cases. As described more fully in the Wright Declaration and the Lumsden Declaration, the Debtors' ability to satisfy critical operating expenses is essential to the Debtors' ability to survive and maintain their asset values. Accordingly, the Debtors have an immediate need for debtor-in-possession financing and the use of Cash Collateral as set forth more fully herein.

#### Background of the DIP Facility

25. To provide the Debtors with the funding necessary to fulfill their administrative and operational obligations throughout the duration of the Chapter 11 Cases, the Debtors

require a postpetition lending facility. Thus, prior to the Petition Date, the Debtors surveyed various sources of postpetition financing, including the Prepetition Lenders and various unrelated third parties, such as Beal Bank/CSG Investments, Bank of America, Versa Capital, PNC Bank, Blackrock Kelso, Alladin Capital, and Fortress Investment Group.

26.     In exploring their options, the Debtors recognized that the obligations owed to the Prepetition Lenders are secured by the Plants and related prepetition collateral and therefore, (i) the liens of these prepetition secured creditors would have to be primed to obtain postpetition financing, (ii) the Debtors would have to find a postpetition lender willing to extend credit that would be junior to the liens of these prepetition secured creditors, or (iii) postpetition financing would have to be extended on an unsecured basis.

27.     In the current economic environment, capital and other forms of financing are virtually non-existent. In fact, all but one of the potential lenders surveyed by the Debtors advised that they either had no interest in providing financing for the ethanol industry and assets, or no interest in providing financing that would require a priming fight with the existing secured lenders. One potential lender did discuss financing with the Debtors, but only if such financing was secured by liens priming those of the Prepetition Lenders on the Plants and related assets. The Prepetition Lenders advised the Debtors' representatives that they would not consent to be primed by another lender group, therefore borrowing from another lender or lending group that required security senior to that of the Prepetition Lenders likely could only be accomplished through an extended, contested hearing on whether the requirements of section 364(d) of the Bankruptcy Code had been satisfied. In addition, despite their efforts, the Debtors were unable to find a postpetition lender willing to extend credit that would be junior to the liens of the Prepetition Lenders or that would be extended on an unsecured basis. In view of

these circumstances, the DIP Lenders were willing to extend postpetition financing and thus prime their own prepetition security interests. Ultimately, the Debtors concluded that the DIP Credit Agreement proposed by the DIP Lenders is desirable because, among other things, the DIP Credit Agreement permits the Debtors to secure the postpetition financing required for their reorganization without having to prime the WestLB Facility through an extended, contested hearing.

28. Moreover, the DIP Lenders' proposal offers the most attractive combination of quality, pricing, fees, and covenant flexibility. In fact, a comparison of the DIP Lenders' proposal to the postpetition facility obtained by the debtors in the VeraSun[9] chapter 11 cases pending in this District shows substantial similarities, particularly with respect to pricing and fees. The DIP Lenders' proposal is also favorable to the pricing and fees of the postpetition facility obtained in the Aventine Renewable Energy chapter 11 case pending in this District.

29. Importantly, the DIP Credit Agreement provides that the Debtors may draw funds immediately (on an interim basis) to meet their administrative and operational obligations during these Chapter 11 Cases. Finally, because the DIP Lenders are comprised of certain of the parties to the WestLB Facility, they have a substantial base of knowledge with respect to the Debtors' business and assets that provide significant benefits, including, but not limited to, the speed with which they would be able to close the proposed DIP Facility. Consequently, the Debtors determined that the DIP Lenders' proposed postpetition financing is the best financing option available under the circumstances.

30. The Debtors and the DIP Lenders engaged in vigorous and extensive arms'-length negotiations with respect to the terms and conditions of the DIP Credit Agreement. Indeed, the

---

[9] As of its chapter 11 filing on October 31, 2008, VeraSun and its subsidiaries operated 17 ethanol plants located in eight states.

Debtors estimate that over fifty (50) hours were spent in face-to-face meetings and conference calls and hundreds of e-mails and other forms of communications were directed between the parties.

**Use of the DIP Facility**

31.    Pursuant to the DIP Credit Agreement, the Debtors may use the proceeds of the DIP Facility to pay the transaction costs related to the closing of the DIP Credit Agreement and, thereafter, to finance the Chapter 11 Cases and for other general corporate purposes pursuant to the DIP Budget to be attached to the Interim and Final orders.

32.    Each of the proposed uses of the DIP Facility confers a direct benefit upon the Debtors and their estates.  Among other things, the DIP Facility allows the Debtors to finance the ordinary costs of their operations, maintain business relationships with vendors, suppliers and customers, make payroll, and satisfy other working capital and operational needs.

**Provisions to be Highlighted Pursuant to Local Rule 4001-2**

33.    The Debtors believe the following provisions of the DIP Credit Agreement must be highlighted pursuant to Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"):

(a)    *Binding the Estate to Validity, Perfection, or Amount of Secured Creditor's Prepetition Lien*. Interim Order ¶¶ C, 30.

(b)    *Waiver of Rights of Estate Under Section 506(c) as to the Final Order*. Interim Order ¶ 19.

(c)    *Granting Liens Solely on Debtors' Section 544, 545, 546, 547, 548, and 549 Claims and Causes of Action*. Interim Order ¶ 10.

(d)    *Using Postpetition Loans from Prepetition Secured Creditor to Pay Part or All of Secured Creditor's Prepetition Debt*. DIP Credit Agreement Section 2.02, definition of "Permitted Prepetition Claim Payments; Interim Order ¶ 3.

34. The provisions of the DIP Credit Agreement were extensively negotiated. The DIP Credit Agreement enables the Debtors to obtain the financing necessary to maintain their operations, pursue reorganization, and maximize the value of their estates.

## Proposed Adequate Protection and Use of Cash Collateral

35. In order to address their working capital needs and fund their reorganization efforts, the Debtors also require the use of Cash Collateral of the Prepetition Lenders. Coupled with the proceeds of the DIP Facility, the use of Cash Collateral will provide the Debtors with necessary additional capital to operate their businesses, pay their employees, maximize value, and successfully reorganize under chapter 11.

36. The Prepetition Lenders have consented to the Debtors' use of Cash Collateral in the ordinary course of business, subject to the Adequate Protection Liens and payments discussed below and the other terms and conditions set forth in the Interim DIP Order. The Debtors will demonstrate at the Final Hearing that the proposed adequate protection discussed below satisfies the requirements of sections 363(e) and 364(d)(1)(B) of the Bankruptcy Code.

37. The Prepetition Lenders are entitled, pursuant to sections 361 and 363(e) of the Bankruptcy Code, to adequate protection. As adequate protection, the Prepetition Lenders shall be granted liens to secure the Prepetition Lenders' claim for any diminution of the value in the Prepetition Collateral or their interests in the Prepetition Collateral under the Prepetition Credit Agreement, to the extent that there is a diminution in the value of their interests in the Prepetition Collateral from and after the Petition Date resulting from (i) the use of such collateral and cash constituting proceeds of such collateral, (ii) the imposition of the DIP Liens, and (iii) the imposition of the automatic stay pursuant to section 362(a) of the Bankruptcy Code (the "Adequate Protection Liens").

38.   The Adequate Protection Liens shall be (i) subject and subordinate only to (i) the DIP Liens, (ii) the Permitted Liens (as defined in the Interim Order) and (iii) the Carve-Out. The Adequate Protection Liens are and shall be valid, perfected, allowed, enforceable, unavoidable and not subject to challenge, dispute or subordination, at the time and date of the entry of the Interim Order. Upon the request of WestLB, the Prepetition Lenders, without any further consent of any party, are authorized and directed to take, execute and deliver such instruments (in each case without representation or warranty of any kind) to enable WestLB, as administrative and collateral agent for the Prepetition Lenders, to further validate, perfect, preserve and enforce the Adequate Protection Liens, and to provide additional evidence of perfection.

39.   In addition to the Adequate Protection Liens, the Borrowers propose to grant and/or pay the Prepetition Lenders the following as adequate protection (i) a Section 507(b) Claim, (ii) the Debtors shall reimburse the Prepetition Lenders on a monthly basis for the reasonable professional fees and expenses of the Prepetition Agent otherwise permitted under the Prepetition Credit Agreement arising (a) before the Petition Date and (b) after the Petition Date to the extent such amounts arise in connection with the enforcement of the protections granted to the Prepetition Lenders pursuant to the DIP Orders; provided, however, that if and to the extent that any payment(s) is challenged by a party in interest under section 506(b) of the Bankruptcy Code and ultimately not allowed under such provision, such payment(s) may be recharacterized as a payment of principal on the Prepetition Obligations; and (iii) such additional adequate protection, as set forth above and in the Interim Order.

40.   The foregoing claims are to be granted and the payments are to be made to the Prepetition Lenders because, among other things, the Debtors will continue to use the Cash Collateral and other Prepetition Collateral in the Debtors' ongoing business and operating facilities until the entry of the Final Order. Such payments are also being made for the purpose

of, among other things, protecting the Prepetition Lenders' claims, obligations, and collateral interests from such use and the potential depreciation and deterioration of the Cash Collateral and Prepetition Collateral as a result of such use and as consideration for the Prepetition Lenders' consent to the use of such collateral under the terms of the Interim Order. At the time of entry of the Final Order, the Prepetition Lenders debt will be satisfied by the proceeds of the DIP Facility.

### The DIP Facility Should Be Authorized

41.     Approval of the DIP Credit Agreement will provide the Debtors with immediate and ongoing access to borrowing availability to pay the Debtors' current and ongoing operating expenses, including postpetition wages and salaries and utility and vendor costs. Unless these expenditures are made, the Debtors would be forced to cease operations, which would result in irreparable harm to their businesses and going concern value and would jeopardize the Debtors' ability to reorganize. The Debtors' reorganization depends in large part on restoring customer and employee confidence and maintaining the operation of their business as they restructure. Accordingly, the Debtors have an immediate need to access the DIP Facility and to use Cash Collateral in order to, among other things, permit the orderly operation of their business by providing customer care and paying their employees, thereby maximizing recoveries for the Debtors' stakeholders. The Debtors believe that such financing and use of Cash Collateral will enable them to stabilize operations and ultimately, in conjunction with a reorganization, restore their profitability. Accordingly, the timely approval of the relief requested herein is imperative.

42.     Section 364(c) of the Bankruptcy Code provides, among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, the court may authorize the debtor to obtain credit or incur

debt (a) with priority over any and all administrative expenses as specified in section 503(b) or 507(b) of the Bankruptcy Code, (b) secured by a lien on property of the estate that is not otherwise subject to a lien, or (c) secured by a junior lien on property of the estate that is subject to a lien. 11 U.S.C. § 364. Section 364(d) of the Bankruptcy Code allows a debtor to obtain credit secured by a senior or equal lien on property of the estate that is subject to a lien, provided that (i) the debtor is unable to obtain such credit otherwise, and (ii) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted. 11 U.S.C. § 364(d).

43. The Debtors' liquidity needs can be satisfied only if the Borrowers are immediately authorized to obtain postpetition financing consisting of: (a) DIP Revolving Loans up to an aggregate principal amount not to exceed $20 million, of which up to $10 million shall be available upon entry of the Interim Order, and (b) a 1.50:1.00 dollar conversion (calculated on a one and one-half dollars of DIP Roll-Up Loans for each dollar of DIP Revolving Loans provided by the DIP Lenders) of the outstanding Prepetition Indebtedness beneficially owned by the applicable DIP Lender (or an affiliate) in an aggregate principal amount not to exceed $30 million (of which up to $15 million shall convert concurrently with the funding of the DIP Revolving Interim Commitment). The Debtors have been unable to (A) procure sufficient financing (i) in the form of unsecured credit allowable under section 503(b)(1), (ii) as an administrative expense under section 364(a) or (b), (iii) in exchange for the grant of a super-priority administrative expense claim pursuant to section 364(c)(1), (iv) without granting priming liens pursuant to section 364(d), and (B) obtain postpetition financing or other financial accommodations from any alternative prospective lender or group of lenders on more favorable terms and conditions than those for which approval is sought herein. Therefore,

the Debtors propose to obtain the financing set forth in the DIP Credit Agreement by providing, *inter alia,* super-priority claims, security interests, and liens pursuant to sections 364(c)(1), (2), (3) and (d) of the Bankruptcy Code.

44.     Having determined that financing is available only under sections 364(c) and (d) of the Bankruptcy Code, the Debtors negotiated the DIP Facility with the DIP Lenders extensively and at arms'-length. Provided that a debtor's business judgment does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in acting in accordance therewith. See, e.g., Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986); In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest."). See also In re Funding Sys. Asset Mgmt. Corp., 72 B.R. 87, 88 (Bankr. W.D. Pa. 1987); In re Curlew Valley Assocs., 14 B.R. 506, 513-14 (Bankr. D. Utah 1981); In re Simasko Prod. Co., 47 B.R. 444, 449 (D. Colo. 1985).

45.     Furthermore, section 364(d) does not require that a debtor seek alternative financing from every possible lender; rather, the debtor simply must demonstrate sufficient efforts to obtain financing without the need to grant a senior lien. In re Snowshoe Co., 789 F.2d 1085, 1088 (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); In re 495 Cent. Park Ave. Corp., 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (debtor testified to numerous failed attempts to procure financing from various sources, explaining that "most lend money only in

return for a senior secured position"); In re Aqua Assocs., 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991) (debtor adequately established that some degree of priming loan was necessary if debtor were to obtain funding).

46.     Substantially all of the Debtors' assets are encumbered and, despite the diligent efforts of the Debtors, the Debtors have been unable to procure the required funding absent granting the proposed super-priority claims and priming liens. The Debtors have negotiated the best terms available to obtain funding they need to maintain sufficient liquidity to preserve their assets over the course of these Chapter 11 Cases. The Debtors submit that the circumstances of these cases require the Debtors to obtain financing under sections 364(c) and (d) of the Bankruptcy Code, and accordingly, the DIP Facility reflects the exercise of their sound business judgment.

47.     There is ample legal support for the type of funding here. See, e.g., In re Smurfit-Stone Container Corp., Case No. 09-10235 (Bankr. D. Del. Jan. 27, 2009) (Shannon, J.) [D.I. 58]; In re Nortel Networks Inc., Case No. 09-10138 (Bankr. D. Del. Jan. 15, 2009) (Gross, J.) [D.I. 54]; In re VeraSun Energy Corp., Case No. 08-12606 (Bankr. D. Del. Nov. 4, 2008) (Shannon, J.) [D.I. 39]; In re Boscov's Inc., Case No. 08-11637 (Bankr. D. Del. Aug. 5, 2008) (Gross, J.) [D.I. 54]; In re Goody's Family Clothing, Inc., Case No. 08-11133 (Bankr. D. Del. June 10, 2008) (Sontchi, J) [D.I. 61]; In re Sharper Image Corp., Case No. 08-10322 (Bankr. D. Del. Feb. 20, 2008) (Gross, J.) [D.I. 44]; In re Hancock Fabrics, Inc., Case No. 07-10353 (Bankr. D. Del. Mar. 22, 2007) (Shannon, J.) [D.I. 56].

48.     The terms and conditions of the DIP Facility are fair and reasonable, and were negotiated extensively by well-represented, independent parties in good faith and at arms'

length. Accordingly, the DIP Lenders and all obligations incurred under the DIP Facility should be accorded the benefits of section 364(e) of the Bankruptcy Code.

## The Use of Cash Collateral Should Be Approved

49.     Under section 363(c)(2) of the Bankruptcy Code, a debtor may not use cash collateral unless "(a) each entity that has an interest in such cash collateral consents; or (b) the court, after notice and a hearing, authorizes such use in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2). The Debtors require the use of the Cash Collateral to fund their day-to-day operations. Indeed, absent such relief, the Debtors' businesses will be brought to an immediate halt, with damaging consequences for the Debtors and their estates and creditors. The interests of the Prepetition Lenders in the Cash Collateral will be protected by the adequate protection set forth above. The Prepetition Lenders have consented to the use of the Cash Collateral on the terms set forth herein and in the Interim Order. Accordingly, the Debtors' request to use Cash Collateral in the operation of their businesses and administration of the Chapter 11 Cases should be approved.

## The Proposed Adequate Protection Should Be Authorized

50.     Section 363(e) of the Bankruptcy Code provides that, "on request of an entity that has an interest in property used . . . or proposed to be used by a debtor in possession, the court . . . shall prohibit or condition such use . . . as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e). Section 361 of the Bankruptcy Code delineates the forms of adequate protection, which include periodic cash payments, additional liens, replacement liens and other forms of relief. 11 U.S.C. § 361. What constitutes adequate protection must be decided on a case-by-case basis. See MNBank Dallas, N.A. v. O'Conner (In re O'Connor), 808 F.2d 1393, 1396 (10th Cir. 1987); In re Martin, 761 F.2d 472 (8th Cir. 1985); In re Shaw Indus., Inc., 300 B.R. 861, 865 (Bankr. W.D. Pa. 2003). The focus of the requirement is to

protect a secured creditor from diminution in the value of its interest in the particular collateral during the period of use. See In re Swedeland Dev. Group, Inc., 16 F.3d 552, 554 (3d Cir. 1994) ("The whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy.") (internal citations omitted).

51. The Prepetition Lenders have agreed to the Debtors' use of Cash Collateral and the Debtors' entry into the DIP Credit Agreement in consideration for the adequate protection provided to them under the DIP Credit Agreement. Moreover, the liens and other protections offered to the Prepetition Lenders will, taken together, sufficiently protect their interest in any collateral taken as security under the Prepetition Credit Agreement. Accordingly, the adequate protection proposed here is fair and reasonable and sufficient to satisfy the requirements of sections 363(c)(2) and (e) of the Bankruptcy Code.

### The Automatic Stay Should Be Modified on a Limited Basis

52. The relief requested herein contemplates a modification of the automatic stay (to the extent applicable) to permit the Debtors to (i) grant the security interests, liens, and super-priority claims described above and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens; (ii) permit the DIP Lenders to exercise, upon the occurrence and during the continuance of an event of default and after three (3) business days' notice thereof, all rights and remedies under the DIP Credit Agreement; and (iii) implement the terms of the proposed DIP Orders.

53. Stay modifications of this kind are ordinary and standard features of postpetition debtor financing facilities and, in the Debtors' business judgment, are reasonable and fair under the present circumstances.

## Interim Approval Should Be Granted

54. Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to use cash collateral or obtain credit, respectively, may not be commenced earlier than fifteen (15) days after the service of such motion. Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral and the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending a final hearing.

55. Pursuant to Bankruptcy Rule 4001(b) and (c), the Debtors request that the Court conduct an expedited preliminary hearing on this Motion and (a) authorize the Debtors to use Cash Collateral; (b) authorize the Borrowers to borrow up to $10 million under the DIP Facility on an interim basis, pending entry of a final order, in order to (i) maintain and finance the ongoing operations of the Debtors, and (ii) avoid immediate and irreparable harm and prejudice to the Debtors' estates and all parties in interest; and (c) schedule the Final Hearing.

56. The Debtors have an urgent and immediate need for cash to continue to operate. Currently, the Debtors do not have sufficient funds with which to operate their businesses on an ongoing basis. Absent authorization from the Court to obtain secured credit, as requested, on an interim basis pending the Final Hearing, the Debtors will be immediately and irreparably harmed. The availability of interim loans under the DIP Facility will provide necessary assurance to the Debtors' vendors, employees, and clients of the Debtors' ability to meet their near-term obligations. Failure to meet these obligations and to provide these assurances likely would have a long-term negative impact on the value of the Debtors' businesses, to the detriment of all parties in interest. Furthermore, the lack of an interim facility would result in accelerated cash demands on the Debtors. Accordingly, the interim relief requested is critical to preserving and maintaining the going concern value of the Debtors and facilitating their reorganization efforts.

## The Debtors Satisfy Bankruptcy Rule 6003

57. Bankruptcy Rule 6003 provides that to the extent relief is necessary to avoid immediate and irreparable harm, a bankruptcy court may approve a motion to "pay all or part of a claim that arose before the filing of the petition" prior to twenty (20) days after the commencement date. Fed. R. Bankr. P. 6003. As described above and in the Wright Declaration, the Debtors' business operations depend on the DIP Facility. The Debtors submit that the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors, as described herein, and that Bankruptcy Rule 6003 has been satisfied.

## Waiver of Bankruptcy Rules 6004(a) and (h)

58. To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the ten-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## Notice

59. No trustee, examiner, or creditors' committee has been appointed in these Chapter 11 Cases. Notice of this Motion will be given to: (a) the Office of the United States Trustee for the District of Delaware; (b) all required government entities; (c) counsel to the Debtors' prepetition secured lenders; (d) counsel to the DIP Agent and DIP Lenders; and (e) the parties included on the Debtors' list of twenty (20) largest unsecured creditors. The Debtors submit that, under the circumstances, no other or further notice is required.

60. As this Motion is seeking first-day relief, notice of this Motion and any order entered hereon will be served on all parties required by Local Rule 9013-1(m). Due to the urgency surrounding this Motion and the nature of the relief herein, the Debtors respectfully submit that no other or further notice need be provided.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter an Order, substantially in the form annexed hereto, granting the relief requested in the Motion and such other and further relief as may be just and proper.

Dated:    Wilmington, Delaware
May 17, 2009

Respectfully Submitted,

_____
Steven M. Yoder (DE Bar No. 3885)
Jeremy W. Ryan (DE Bar No. 4057)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, Sixth Floor
1313 North Market Street
P.O. Box 951
Wilmington, Delaware 19899-0951
Phone:  (302) 984-6000
Facsimile:  (302) 984-1192

- and -

Lawrence C. Gottlieb (LB 2565)
Richard S. Kanowitz (RK 0677)
COOLEY GODWARD KRONISH LLP
1114 Avenue of the Americas
New York, NY 10036
Phone:  (212) 479-6000
Facsimile:  (212) 479-6275

*Proposed Counsel for Debtors and Debtors in Possession*

# EXHIBIT A

## Interim Order

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| PACIFIC ETHANOL HOLDING  CO. LLC, <u>et al.</u>,[1] | Case No. 09-_____ (___) |
| Debtors. | Joint Administration Requested |

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN
POSTPETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(c),
363(e), 364(c), 364(d)(1) AND 364(e) AND (B) UTILIZE CASH COLLATERAL
OF PREPETITION SECURED ENTITIES, (II) GRANTING
ADEQUATE PROTECTION TO PREPETITION SECURED ENTITIES,
(III) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY
RULES 4001(b) AND 4001(c), AND (IV) GRANTING RELATED RELIEF**

This matter is before the Court on the motion dated May 17, 2009 (the "<u>Motion</u>")[2]

of Pacific Ethanol Holding Co. LLC ("<u>Holding</u>") and its affiliated debtors, as debtors-in-

possession (collectively, the "<u>Debtors</u>") in the above-referenced chapter 11 cases (collectively,

the "<u>Chapter 11 Cases</u>"), for entry of an interim order (this "<u>Interim Order</u>") and a final order

("<u>Final Order</u>"), under sections 105, 361, 362, 363(c), 363(e), 364(c), 364(d)(1) and 364(e) of

title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "<u>Bankruptcy Code</u>"),

and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the

"<u>Bankruptcy Rules</u>") and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure

---

[1]    The Debtors are: Pacific Ethanol Holding Co. LLC (Tax ID No. XX-XXX6981), Pacific Ethanol Stockton, LLC (Tax ID No. XX-XXX8349), Pacific Ethanol Columbia, LLC (Tax ID No. XX-XXX9392), Pacific Ethanol Madera, LLC (Tax ID. No. XX-XXX3339), Pacific Ethanol Magic Valley, LLC (Tax ID. No. XX-XXX7391),. The mailing address for Pacific Ethanol Holding Co., LLC. is 400 Capitol Mall, Suite 2060, Sacramento, CA 95814.

[2]    All defined terms shall have the meaning ascribed to them in the Motion or DIP Documents (as defined below) unless otherwise defined herein.

of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), seeking, among other things:

(1)     authorization for Holding, Pacific Ethanol Stockton, LLC ("Stockton"), Pacific Ethanol Columbia, LLC ("Columbia"), Pacific Ethanol Madera, LLC ("Madera"), and Pacific Ethanol Magic Valley, LLC ("Magic Valley" and together with Holding, Stockton, Columbia and Madera, each as a Debtor, the "Borrowers") to obtain post-petition financing (the "DIP Facility") consisting of: (a) a super priority non-amortizing revolving credit facility (the "DIP Revolving Loans") in an aggregate principal amount not to exceed $20 million (the "DIP Revolving Commitment"), of which up to $10 million shall be available upon entry of this Interim Order ("DIP Revolving Interim Commitment"), and (b) a 1.50:1.00 dollar conversion (calculated on the basis of a one and one-half dollar of DIP Roll-Up Loans (as defined below) for each dollar of DIP Revolving Loans provided by the DIP Lenders) in respect of the outstanding term loans under the Prepetition Credit Facility beneficially owned by each applicable DIP Lender (as defined below) (or an affiliate) at 5 p.m. (prevailing Eastern time) on May 15, 2009 (the "DIP Roll-Up Loans") in an aggregate principal amount not to exceed $30 million (the "DIP Roll-Up Amount") of which up to $15 million shall convert concurrently with the funding of the DIP Revolving Interim Commitment upon entry of this Interim Order, each subject to the terms and conditions of the DIP Facility Documents (as defined below), with WestLB AG, New York Branch ("WestLB"), as administrative agent and collateral agent (collectively, the "DIP Agent") for itself and a syndicate of financial institutions (together with WestLB, the "DIP Lenders") and Amarillo National Bank ("DIP Accounts Bank"), pursuant to the terms of this Interim

Order and that certain Debtor-in-Possession Credit Agreement, by and among the Borrowers, DIP Agent and DIP Lenders (as the same may be amended, restated, supplemented or otherwise modified from time to time pursuant to the terms thereof, the "DIP Agreement," and together with any related documents and instruments delivered pursuant to or in connection therewith (including the "Financing Documents" referenced therein), the "DIP Documents"), as generally summarized by the Debtor-In-Possession Credit Facility Term Sheet, attached hereto as Exhibit A (the "DIP Term Sheet");

(2)     authorization for the Debtors to execute and enter into the DIP Documents (which shall be in form and substance acceptable to the DIP Agent and the DIP Lenders) and to perform such other and further acts as may be required in connection with the DIP Documents;

(3)     authorization for the Debtors to grant (i) security interests and liens (including liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code and limited priming liens pursuant to section 364(d) of the Bankruptcy Code) to the DIP Agent, for the benefit of the DIP Agent and the DIP Lenders, to secure all obligations of the Debtors under and with respect to the DIP Facility (collectively, the "DIP Obligations"), and (ii) superpriority claims (including a superpriority administrative claim pursuant to section 364(c)(1) of the Bankruptcy Code) to the DIP Agent and the DIP Lenders, with respect to the DIP Obligations, as more fully set forth in this Interim Order;

(4)     authorization for the Debtors' use of cash collateral, as such term is defined in section 363(a) of the Bankruptcy Code (as so defined, "Cash Collateral"), on the terms and conditions set forth in this Interim Order;

(5)     authorization to provide adequate protection of the liens and security interests (such liens and security interests, the "Prepetition Liens") granted for the benefit of the prepetition senior secured lenders (such lenders in such capacities, the "Prepetition Lenders") under that certain Credit Agreement, dated as of February 27, 2007 (as amended, restated, supplemented or otherwise modified from time to time and in effect on the date hereof, the "Prepetition Credit Agreement"), among the Borrowers, the Prepetition Lenders, WestLB, as Administrative Agent (in such capacity and in the capacity of Collateral Agent under the security documents for the Prepetition Obligations (as defined herein) on behalf of the Prepetition Lenders, the "Prepetition Agent") and as a Prepetition Lender, and Amarillo National Bank, as accounts bank (the "Prepetition Accounts Bank"), securing the Borrowers' obligations (the "Prepetition Obligations") under the Prepetition Credit Agreement, the Prepetition Security Documents (as defined below) and all collateral and ancillary documents executed or delivered in connection therewith (the "Prepetition Facility Documents"), as more fully set forth in this Interim Order;

(6)     an emergency interim hearing (the "Interim Hearing") on the Motion for this Court to consider entry of this Interim Order, which, among other things, (i) authorizes the Debtors, on an interim basis, to obtain from the DIP Lenders under the DIP Facility up to an aggregate principal amount not to exceed $20 million (of which $10 million shall be available upon the entry of this Interim Order) in DIP Revolving Commitments and convert up to an aggregate principal amount of $30 million in DIP Roll-Up Amounts (of which $15 million shall convert upon entry of this Interim Order), pursuant to the terms of, and on the conditions contained in, the DIP Agreement and this

Interim Order; (ii) authorizes each Borrower to guarantee the DIP Obligations of each other Borrower; (iii) authorizes the Debtors' use of the Cash Collateral; and (iv) grants the adequate protection described herein;

(7)     the scheduling of a final hearing (the "Final Hearing") on the Motion no later than July 1, 2009 to consider entry of a Final Order authorizing the borrowings under the DIP Documents on a final basis and approve the form of notice procedures with respect thereto; and

(8)     modification of the automatic stay imposed under section 362 of the Bankruptcy Code to the extent necessary to permit the (a) Debtors, (b) DIP Agent and DIP Lenders, and (c) Prepetition Lenders and Prepetition Agent (together, the "Prepetition Secured Entities," and collectively with the DIP Agent and the DIP Lenders, the "Secured Lending Entities") to implement the terms of this Interim Order.

This Court having found that, under the circumstances, due and sufficient notice of the Motion and Interim Hearing was provided by the Debtors as set forth in Paragraph K below, and having held the Interim Hearing on May __, 2009 after considering all the pleadings filed with this Court; and having overruled all unresolved objections to the relief requested in the Motion; and upon the record made by the Debtors at the Interim Hearing and the Affidavit of Christopher W. Wright in Support of First Day Motions, and after due deliberation and consideration and good and sufficient cause appearing therefore:

## THE COURT HEREBY FINDS AND CONCLUDES AS FOLLOWS:

A.     Filing of Petition. On May 17, 2009 (the "Petition Date"), each Debtor filed a voluntary petition (collectively, the "Petitions") with this Court commencing a case under chapter 11 of the Bankruptcy Code. The Debtors are continuing to operate their respective

businesses and manage their respective properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

B.    Jurisdiction; Venue.    This Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.    This is a core proceeding pursuant to 28 U.S.C. § 157(b).    The statutory predicates for the relief sought herein are sections 105, 361, 362, 363 and 364 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001(b) and 9014.    Venue of the Chapter 11 Cases and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

C.    Debtors' Stipulations.    Subject to the limitations thereon described below in Paragraph 15, the Debtors hereby agree and stipulate that:

(i)    as of the Petition Date, Holding, Stockton, Columbia, Madera and Magic Valley (collectively, the "Prepetition Credit Parties") were truly and justly indebted to the Prepetition Lenders pursuant to the Prepetition Facility Documents in the aggregate principal amount of $247,307,091, plus accrued and unpaid interest with respect thereto and any additional fees, costs and expenses as provided under the Prepetition Facility Documents (the "Prepetition Indebtedness")[3];

(ii)    pursuant to certain security agreements, blocked account, lockbox and pledged account control agreements, mortgages, deeds of trust, assignments, and other collateral documents and agreements (as amended, restated, supplemented or otherwise modified from time to time and in effect on the date hereof, collectively, the "Prepetition Security Documents"), and the other Prepetition Facility Documents, the

---

[3]    Pacific Ethanol California, Inc. ("PECA"), the intermediate holding company for Holding, is not included as a Borrower or Guarantor under the Prepetition Credit Agreement but has provided a secured accommodation pledge of its ownership interest in Holding pursuant to the terms of the Prepetition Credit Agreement. PECA is not a debtor in these proceedings.

Prepetition Credit Parties granted to and/or for the benefit of the Prepetition Secured Entities a first priority valid, perfected and enforceable security interest in certain real and personal property of the Prepetition Credit Parties (the "Prepetition Collateral"); and

(iii)    (a) the Prepetition Obligations constitute legal, valid and binding Obligations (as defined in the Prepetition Credit Agreement) of each of the Prepetition Credit Parties; (b) no offsets, defenses or counterclaims to the Prepetition Obligations exist; (c) no portion of the Prepetition Obligations is subject to avoidance, disallowance, reduction or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (d) the Prepetition Facility Documents are valid and enforceable by the Prepetition Secured Entities against each of the applicable Prepetition Credit Parties; (e) the Prepetition Liens constitute valid, binding, enforceable and perfected liens in and to the Prepetition Collateral, having the priority set forth in the Prepetition Facility Documents and subject only to the liens described in the Prepetition Facility Documents, and are not subject to avoidance, reduction, disallowance, disgorgement, counterclaim, surcharge or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (f) the Prepetition Obligations constitute allowed secured claims against the applicable Debtors' estates; and (g) no claim of or cause of action held by the Debtors exists against the Prepetition Agent, Prepetition Lenders or their agents, whether arising under applicable state or federal law (including, without limitation, any recharacterization, subordination, avoidance or other claims arising under or pursuant to sections 105, 510 or 542 through 553 of the Bankruptcy Code), or whether arising under or in connection with any of the Prepetition Facility Documents (or the transactions

contemplated thereunder), Prepetition Obligations or Prepetition Liens, including without limitation, any right to assert any disgorgement or recovery.

D.    Budget for DIP Facility. Attached hereto as Exhibit B is a rolling 13-week cashflow budget setting forth all projected cash receipts and cash disbursements (by line item) on a weekly basis for the time period from May 17, 2009 through and including July 1, 2009 (the "Initial Approved Budget"). The Initial Approved Budget may be modified or supplemented from time to time by additional budgets (covering any time period covered by a prior budget or covering additional time periods) prepared by the Debtors, without subsequent notice to or order of the Court (each such additional budget, a "Supplemental Approved Budget" and together with the Initial Approved Budget, the "Approved Budget"). The Initial Approved Budget is an integral part of this Interim Order and has been relied upon by the DIP Agent and the DIP Lenders in deciding to agree to this Interim Order, to provide the DIP Facility and to permit the use of the Cash Collateral. The Debtors represent and warrant to the DIP Agent, the DIP Lenders and this Court that the Approved Budget includes and contains the Debtors' best estimate of all operational receipts and all operational disbursements, fees, costs and other expenses that will be payable, incurred and/or accrued by any of the Debtors during the period covered by the Approved Budget and that such operational disbursements, fees, costs and other expenses will be timely paid in the ordinary course of business pursuant to and in accordance with the Approved Budget unless such operational disbursements, fees, costs and other expenses are not incurred or otherwise payable. The Debtors shall be permitted a variance between the aggregate actual cash receipts and disbursements on a consolidated basis and the amounts projected in the Approved Budget of 10% in the aggregate, measured on a rolling four-week basis.

E.     Immediate Need for Funding. Based upon the pleadings and proceedings of record in the Chapter 11 Cases, the Debtors do not have sufficient available sources of working capital and financing to carry on the operation of their businesses without the DIP Facility. As a result of the Debtors' financial condition, the use of Cash Collateral alone would be insufficient to meet the Debtors' immediate postpetition liquidity needs. The Debtors' ability to maintain business relationships with their vendors, suppliers and customers, pay their employees, purchase and supply new inventory and otherwise finance their operations is essential to the Debtors' continued viability. In addition, (i) the Debtors' critical need for financing is immediate; (ii) in the absence of the DIP Facility, the continued maintenance and limited operation of the Debtors' businesses would not be possible and serious and irreparable harm to the Debtors and their estates would occur; and (iii) the preservation, maintenance and enhancement of the going concern value of the Debtors are of the utmost significance and importance to a successful reorganization of the Debtors.

F.     No Alternate Financing. The Debtors are unable to obtain sufficient interim and long-term financing from sources other than the DIP Lenders on terms more favorable than under the DIP Facility and the DIP Documents, and are not able to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code. The Debtors are also unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code for the purposes set forth in the DIP Agreement without the Debtors (i) granting to the DIP Agent and the DIP Lenders, subject to the Carve-Out as provided herein, (x) the DIP Superpriority Claims (as defined below) and (y) the DIP Liens (as defined below) in the DIP Collateral (as defined below), as provided herein and in the DIP Documents and (ii) allowing any DIP Lender to convert its respective pro rata share of

outstanding Prepetition Indebtedness into DIP Roll-Up Loans on a basis of one and one-half dollar of DIP Roll-Up Loans for each dollar of DIP Revolving Loans provided by such DIP Lender.

G.   Reasonable; Good Faith.  Based upon the pleadings and proceedings of record in the Chapter 11 Cases, (i) the terms and conditions of the DIP Facility are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duty and are supported by reasonably equivalent value and fair consideration, (ii) the DIP Facility has been negotiated in good faith and at arm's length among the Debtors, the DIP Agent and the DIP Lenders and (iii) any credit extended, loans made and other financial accommodations extended to the Debtors by the DIP Lenders have been extended, issued or made, as the case may be, in "good faith" within the meaning of section 364(e) of the Bankruptcy Code.

H.   Use of Cash Collateral.  An immediate and critical need exists for the Debtors to use the Cash Collateral (in addition to the DIP Facility) to continue to operate their businesses in the ordinary course, pay wages, maintain business relationship with vendors, suppliers and customers, make capital expenditures, make adequate protection payments, generally conduct their business affairs so as to avoid immediate and irreparable harm to their estates and the value of their assets, and afford the Debtors adequate time to finalize and execute documents under the DIP Facility (subject to and within the limits imposed by the terms of this Interim Order).

I.   Consent by Prepetition Lenders.  The Prepetition Lenders have consented to (i) the financing arrangements contemplated by this Interim Order and the DIP Documents and (ii) Debtors' proposed use of their Cash Collateral, on the terms and conditions set forth in this

Interim Order.  The consent of the Prepetition Lenders is expressly limited to the postpetition financing being provided by the DIP Lenders (as contemplated by this Interim Order and the DIP Documents) and the provision of adequate protection herein, and shall not extend to any other postpetition financing or to any modified version of the DIP Facility.

J.　　Adequate Protection.  The adequate protection provided to the Prepetition Agent and the Prepetition Lenders for any diminution in the value of such parties' respective interest in the Prepetition Collateral from and after the Petition Date, including, without limitation, from the DIP Facility and use of the Cash Collateral, pursuant to the provisions of this Interim Order, is consistent with and authorized by the Bankruptcy Code and is offered by the Debtors to protect such parties' interests in the Prepetition Collateral in accordance with sections 361, 362 and 363 of the Bankruptcy Code.  The consent of the Prepetition Agent and the Prepetition Lenders to the priming of their liens by the DIP Liens does not constitute, and shall not be construed as constituting, an acknowledgment or stipulation by the Prepetition Agent or the Prepetition Lenders that their respective interests in the Prepetition Collateral are adequately protected pursuant to this Interim Order or otherwise.  The adequate protection provided herein and other benefits and privileges contained herein are necessary in order to obtain the foregoing consents and agreements and the non-objection of such parties.

K.　　Notice.  Notice of the Interim Hearing and the entry of this Interim Order has been provided to: (i) the largest unsecured creditors on a consolidated basis, as listed and filed with the Petition; (ii) the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee"); (iii) all required governmental entities; (iv) counsel to the DIP Agent; (v) counsel to the Prepetition Agent; (vi) the Internal Revenue Service; (vii) the Prepetition Lenders; and (viii) any other parties requesting such notice (collectively, the "Notice Parties").  Requisite

notice of the Motion and the relief requested thereby and this Interim Order has been provided in accordance with Bankruptcy Rule 4001, and no other notice need be provided for entry of this Interim Order.

L.     Good Cause Shown; Best Interest. The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2). Absent entry of this Interim Order, the Debtors' businesses, properties and estates will be immediately and irreparably harmed. This Court concludes that good cause has been shown and that entry of this Interim Order is in the best interest of the Debtors' respective estates and creditors as its implementation will, among other things, allow for the continued operation of the Debtors' existing businesses and enhance the Debtors' prospects for successful reorganization.

M.     No Liability to Third Parties. The Debtors stipulate and the Court finds that in making decisions to advance loans to the Debtors, in administering any loans, in permitting the Debtors to use Cash Collateral, in accepting the Interim Approved Budget or any future Supplemental Approved Budget or in taking any other actions permitted by this Interim Order or the DIP Documents, none of the DIP Agent nor DIP Lenders shall be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors.

Based on the foregoing, and upon the record made before this Court at the Interim Hearing, and good and sufficient cause appearing therefore,

## IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

1.     Approval of Interim Order. The Motion is approved on the terms and conditions set forth in this Interim Order. Any objections that have not previously been

withdrawn are hereby overruled. This Interim Order shall become effective immediately upon its entry.

2. **Approval of DIP Documents; Authority Thereunder.** The Debtors are hereby authorized to enter into the DIP Documents, including the DIP Agreement, and such additional documents, instruments and agreements as may be required or requested by the DIP Agent and the DIP Lenders to implement the terms or effectuate the purposes of this Interim Order. The terms and conditions of the DIP Documents are hereby approved and (i) the Borrowers are authorized to comply with and perform all of the terms and conditions contained therein, and (ii) each Borrower is directed to repay amounts borrowed, together with interest and premiums (as applicable) thereon and any other outstanding DIP Obligations to the DIP Lenders in accordance with and subject to the terms and conditions set forth in the DIP Documents and this Interim Order.

3. **Authorization to Borrow/Use of Cash Collateral.** Upon finalizing and executing the DIP Agreement and the other DIP Documents, the Debtors are immediately authorized (a) to borrow from the DIP Lenders under the DIP Facility up to an aggregate principal amount not to exceed $20 million (with up to $10 million available upon the entry of this Interim Order) under the DIP Revolving Loans and (b) to effectuate a 1.50:1.00 dollar conversion (calculated on the basis of a one and one-half dollars of DIP Roll-Up Loans for each dollar of DIP Revolving Loans provided by the DIP Lenders) in respect of the outstanding term loans under the Prepetition Credit Facility beneficially owned by the applicable DIP Lender (or an affiliate) at 5 p.m. (prevailing Eastern time) on May 15, 2009, in an aggregate principal amount not to exceed $30 million (of which up to $15 million shall convert concurrently with the funding of the DIP Revolving Interim Commitment upon entry of this Interim Order), each

subject to the terms and conditions of the DIP Documents, provided, however, that if any DIP Agent and/or DIP Lender in its sole discretion advances funds in excess of these limitations or any other limitations or restrictions set forth herein, such advances shall constitute DIP Obligations and shall be entitled to the benefits of the DIP Documents and this Interim Order. The Debtors are authorized to use the proceeds of the DIP Revolving Loans and the Cash Collateral in the operation of the Debtors' businesses, provided, that any proposed DIP Revolving Loan or use of Cash Collateral is consistent with the terms of the DIP Documents, the Approved Budget and this Interim Order.

4.    Payment of Adequate Protection.  Upon finalizing and executing the DIP Agreement and the other DIP Documents, the Debtors are authorized to use the proceeds of the DIP Revolving Loans, in part, to make certain limited adequate protection payments to the Prepetition Lenders in accordance with the terms and conditions of the DIP Agreement, the Approved Budget and this Interim Order (including Paragraph 12 of this Interim Order).

5.    Interest on DIP Loans.  The rate of interest to be charged for the DIP Revolving Loans, the DIP Roll-Up Loans and other extensions of credit to the Debtors pursuant to the DIP Agreement shall be the rates set forth in the DIP Agreement and shall be payable at the times set forth in the DIP Agreement.

6.    Payment of DIP Fees and Expenses.  Subject to and in accordance with the Approved Budget, the Debtors are hereby authorized and directed to pay upon demand all reasonable fees, costs, expenses and other amounts payable under the terms of the DIP Documents and all other reasonable, out-of-pocket costs and expenses of the DIP Agent, the DIP Lenders, the Prepetition Agent and the Prepetition Lenders in accordance with the terms of the DIP Documents (including, without limitation, the reasonable, out-of-pocket prepetition and

postpetition fees, costs and expenses of legal counsel, financial advisors and third-party appraisers, advisors and consultants advising the DIP Agent, the DIP Lenders, the Prepetition Agent or the Prepetition Lenders); provided, however, the Debtors shall only be required to pay to the Prepetition Agent and the Prepetition Lenders such amounts that have accrued and are outstanding on or prior to the Petition Date, except as otherwise permitted in Paragraph 12(i). None of such fees, costs and expenses shall be subject to Court approval or U.S. Trustee guidelines, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with this Court. In addition, the Debtors are hereby authorized and directed to indemnify the DIP Agent and DIP Lenders (and each of their respective directors, officers, employees, agents, representatives, attorneys, consultants, advisors and controlling persons) against any liability arising in connection with the DIP Documents, to the extent set forth in the DIP Documents. All such unpaid fees, costs and expenses and indemnities of the DIP Agent and DIP Lenders shall be secured by the DIP Collateral and afforded all of the priorities and protections afforded to the DIP Obligations under this Interim Order and the DIP Documents.

7. **Validity of DIP Documents.** Upon execution and delivery of the DIP Documents, the DIP Documents shall constitute, and are hereby deemed to be the legal, valid and binding obligations of the Debtors party thereto, enforceable against each such Debtor in accordance with the terms of the DIP Documents. Any DIP Revolving Loans advanced under the DIP Agreement until the Final Hearing will be made only to fund the Debtors' working capital and general corporate needs, in each case in the ordinary course of business to the extent permitted under the DIP Agreement, and to pay such other amounts as are required or permitted to be paid pursuant to the DIP Agreement, this Interim Order and any other orders of this Court,

all subject to and in accordance with the Approved Budget. No obligation, payment, transfer or grant of security under the DIP Documents or this Interim Order shall be stayed, restrained, voided, voidable or recoverable under the Bankruptcy Code or under any applicable non-bankruptcy law, or subject to any defense, reduction, setoff, recoupment or counterclaim.

8.    **Perfection in Debtors' Cash.** From the Petition Date until the DIP Obligations have been paid in full in cash, all cash receipts, Cash Collateral and all proceeds from the sale or other disposition of the DIP Collateral or Prepetition Collateral and all other proceeds of such collateral of any kind which is now or shall come into the possession or control of any of the Debtors, or to which any of the Debtors is now or shall become entitled, shall be promptly deposited only into accounts upon which the Prepetition Agent has perfected Prepetition Liens and such collections and proceeds shall remain subject to all of the security interests and liens of the DIP Agent and DIP Lenders (subject to any further orders of the Court) and shall be treated in accordance with this Interim Order. Subject to the Carve-Out and other provisions of this Interim Order, all financial institutions in which the Debtors' accounts are located are authorized and directed to comply with any request of the DIP Agent to turn over to the DIP Agent all funds therein without offset or deduction of any kind to the extent necessary to pay the outstanding indebtedness in full under the DIP Facility, and the Debtors are authorized and directed to enter into such blocked account agreements with cash dominion with the DIP Agent and such financial institutions as the DIP Agent may require.

9.    **DIP Superpriority Claims.** In accordance with Bankruptcy Code sections 364(c)(1) and 364(d), the DIP Obligations shall constitute superpriority administrative expense claims (the "DIP Superpriority Claims") against each of the Debtors with priority in payment over any and all administrative expenses, adequate protection claims, diminution claims and all

other claims of against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, Bankruptcy Code sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 and 1114 or otherwise, including those resulting from the conversion of any of the Chapter 11 Cases pursuant to section 1112 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment; provided, however, that the DIP Superpriority Claims shall be subject to the Carve-Out (as defined below).

      10.   <u>DIP Liens</u>. As security for the DIP Obligations, the DIP Agent and the DIP Lenders are hereby granted (effective upon the date of this Interim Order, without the necessity of the execution by the Debtors or the filing or recordation of mortgages, security agreements, lock box or control agreements, financing statements, or any other instruments or otherwise) valid, binding and fully perfected, security interests in, and liens upon (the "<u>DIP Liens</u>"), all present and after-acquired property of the Debtors of any nature whatsoever, including, without limitation, all cash and cash equivalents contained in any account maintained by any of the Debtors, and all Avoidance Actions (as defined below) of the Debtors or their estates (collectively with all proceeds and products of any or all of the foregoing, the "<u>DIP Collateral</u>"), subject only to the payment of the Carve-Out, which shall consist of:

      (a)   <u>First Lien on Cash Balances and Unencumbered Property</u>. Pursuant to section 364(c)(2) of the Bankruptcy Code, a continuing, enforceable, first priority, fully-perfected lien and security interest upon all of the Debtors' right, title and

interest in, to and under all DIP Collateral that is not otherwise encumbered by a validly perfected security interest or lien on the Petition Date as permitted by the Prepetition Credit Agreement (collectively, the "Unencumbered Property"). Subject only to and effective upon entry of the Final Order, Unencumbered Property shall also include the Debtors' claims and causes of action under sections 502(d), 544, 545, 547, 548, 549, 550, and 553 of the Bankruptcy Code and any other avoidance actions under the Bankruptcy Code and the proceeds thereof and property received thereby whether by judgment, settlement or otherwise, whether pursuant to federal law or applicable state law (collectively, "Avoidance Actions").

(b)     Liens Junior to Certain Other Liens. Pursuant to section 364(c)(3) of the Bankruptcy Code, a junior, perfected lien and security interest (other than as set forth in clause (c) below) upon all of the Debtors' right, title and interest in, to and under all DIP Collateral which is subject to (A) any validly perfected security interest or lien in existence as of the Petition Date that is not subject to section 552(a) of the Bankruptcy Code, or (B) any valid security interest or lien perfected (but not granted) after the Petition Date (to the extent such perfection in respect of a pre-Petition Date claim is expressly permitted under the Bankruptcy Code) that is not subject to section 552(a) of the Bankruptcy Code.

(c)     Liens Priming Prepetition Secured Entities' Liens. Pursuant to section 364(d)(1) of the Bankruptcy Code, a first priority, senior, priming, perfected lien and security interest upon all of the Debtors' right, title and interest in, to and under the DIP Collateral, subject only to a valid perfected lien that is a "Permitted Lien" (as defined in the DIP Agreement) and expressly permitted in the DIP Agreement to be senior to the

DIP Liens granted to the DIP Agent and the DIP Lenders in this Interim Order to secure the DIP Obligations. Such security interest shall be senior to and prime the Prepetition Liens and the Adequate Protection Liens (as defined below), but shall be junior to any valid, perfected, enforceable and unavoidable security interests and liens of other parties, if any, on such property existing immediately prior to the Petition Date otherwise permitted by the Prepetition Credit Agreement.

(d)    <u>Liens Senior to Certain Other Liens</u>.  The DIP Liens and the Adequate Protection Liens shall not be subject or subordinate to (i) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code, (ii) any liens arising after the Petition Date including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability of the Debtors, or (iii) any intercompany or affiliate liens of the Debtors.

11.    <u>Priority of DIP Liens</u>.  Notwithstanding anything to the contrary herein, the DIP Liens granted hereunder to the DIP Lenders under the DIP Roll-Up Loans shall be *pari passu* to the DIP Liens granted hereunder to the DIP Lenders under the DIP Revolving Loans in respect of the DIP Collateral.

12.    <u>Prepetition Credit Facility Adequate Protection</u>.  As adequate protection for the interests of the Prepetition Agent and the Prepetition Lenders on account of the Prepetition Liens as a result of (a) the provisions of this Interim Order granting first priority and/or priming liens on such Prepetition Collateral to the DIP Agent and DIP Lenders; (b) authorizing the use of Cash Collateral; (c) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code; or (d) otherwise, pursuant to sections 361(a), 363(c) and

364(d)(1) of the Bankruptcy Code, the Prepetition Agent and Prepetition Lenders are hereby granted, solely to the extent of the diminution in value of the Prepetition Liens in the Prepetition Collateral from and after the Petition Date, the following (collectively, the "Adequate Protection Obligations"):

    (i)    Fees and Expenses.  Subject to and in accordance with the Approved Budget, the Prepetition Agent, on behalf of the Prepetition Lenders, is hereby granted payments in cash from the Debtors on a current basis of all fees, costs and expenses of payable to the Prepetition Agent under the Prepetition Credit Agreement as in effect on the Petition Date, including but not limited to, the reasonable fees and disbursements of counsel, financial and other third party advisors, appraisers and consultants for the Prepetition Agent promptly upon receipt of invoices therefor (subject in all respects to applicable privilege or work product doctrines) and without the necessity of filing motions or fee applications, including such amounts arising (A) before the Petition Date and (B) after the Petition Date to the extent such amounts arise in connection with the enforcement of the protections granted to the Prepetition Lenders pursuant to this Order; provided, however, if and to the extent that any payment(s) is challenged by a party in interest under section 506(b) of the Bankruptcy Code and ultimately not allowed under such provision, such payment(s) may be recharacterized as a payment of principal on the Prepetition Obligations.;

    (ii)    Adequate Protection Liens.  The Prepetition Agent, on behalf of the Prepetition Lenders, is hereby granted valid, enforceable, unavoidable and fully perfected replacement liens and security interests, subject to the Carve-Out, in the collateral of the same nature and type as the Prepetition Collateral, on the same basis and

in the same relative priority as the Prepetition Liens, which, with respect to the Prepetition Collateral and the DIP Collateral, shall be junior in all respects to the DIP Liens (the "Adequate Protection Liens"). The Adequate Protection Liens shall be deemed to be legal, valid, binding, enforceable, perfected liens, not subject to subordination or avoidance, for all purposes in the Chapter 11 Cases. Except as otherwise set forth in this Paragraph 12 or otherwise in this Interim Order, the Adequate Protection Liens shall not be subordinated or be made *pari passu* with any other lien under section 364(d) of the Bankruptcy Code or otherwise. The Adequate Protection Liens shall be deemed to be perfected automatically upon the entry of this Interim Order, without the necessity of filing of any UCC-1 financing statement, state or federal notice, mortgage or other similar instrument or document in any state or public record or office and without the necessity of taking possession or control of any DIP Collateral.

(iii) <u>503 and 507 Claims</u>. The Prepetition Agent, on behalf of the Prepetition Lenders, is hereby granted, subject to the payment of the Carve-Out, superpriority administrative expense claims (the "Prepetition Superpriority Claims") under sections 503 and 507 of the Bankruptcy Code against the Debtors' estates to the extent that the Adequate Protection Liens do not adequately protect against the diminution in value of the Prepetition Liens, which Prepetition Superpriority Claims, if any, shall have priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, Bankruptcy Code sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 and 1114, or otherwise and including those resulting from the conversion of any of the Chapter 11 Cases pursuant to section 1112 of the Bankruptcy

Code; provided that at all times while such claim is in full force and effect pursuant to this Interim Order, the Prepetition Superpriority Claims shall be junior in all respects to the DIP Superpriority Claims;

      (iv)   <u>Monitoring of Collateral</u>. The Prepetition Agent shall be permitted to retain expert consultants and financial advisors at the expense of the Debtors, which consultants and advisors shall be given reasonable access for purposes of monitoring the business of the Debtors and the value of the DIP Collateral; and

      (v)   <u>Financial Reporting</u>. The Debtors shall provide the Prepetition Agent with financial and other reporting as described in the Prepetition Credit Agreement;

provided, however, that this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of the Prepetition Agent or the Prepetition Lenders to seek additional forms of adequate protection at any time.

      13.   <u>No Waiver of Prepetition Credit Agreement Provisions; Reservation of Rights</u>. Except as otherwise specifically provided in this Interim Order, nothing contained in this Interim Order shall be deemed a waiver or constitute a consent to the modification of any provision contained in the Prepetition Credit Agreement by the Prepetition Agent or the Prepetition Lenders, including, but not limited to, the incurrence or issuance of any indebtedness by the Debtors, the incurrence of any lien in connection therewith or the making of any payment by the Debtors. Under the circumstances and given that the above-described adequate protection is consistent with the Bankruptcy Code, including section 506(b) thereof, the Court finds that the adequate protection provided herein is reasonable and sufficient to protect the interests of the Prepetition Agent and Prepetition Lenders.

14.     Carve-Out. Upon the occurrence of the earlier of (the "Carve-Out Event")

(i) an Event of Default (as such term is defined in the DIP Agreement) and continuance thereof

and (ii) the Maturity Date (as defined in the Credit Agreement), to the extent unencumbered

funds are not available to pay administrative expenses in full, the DIP Liens, DIP Superpriority

Claims, Prepetition Superpriority Claims, Adequate Protection Liens, and Prepetition Liens, shall

be subject to the payment of (x) the aggregate amount of any budgeted and unpaid fees, costs and

expenses that were accrued or incurred prior to the Carve-Out Event by the professionals

retained by the Debtors or any professionals retained by any official unsecured creditors'

committee (the "Committee") (collectively, the "Professionals") to the extent allowed by an

order of this Court, plus (y) those fees, costs and expenses incurred by Professionals after the

Carve-Out Event and subsequently allowed by order of this Court and in compliance with the

DIP Budget in an amount not to exceed $250,000 in the aggregate, plus (z) fees required to be

paid to the Clerk of the Court and to the U.S. Trustee pursuant to 28 U.S.C. § 1930 (collectively,

the "Carve-Out"); provided further that following a Carve-Out Event any amounts paid to

Professionals by any means will reduce the Carve-Out on a dollar-for-dollar basis; and provided,

further, that no portion of the Carve-Out, DIP Facility, DIP Collateral, Prepetition Collateral or

Cash Collateral shall include, apply to, or be available for any fees, costs or expenses incurred by

any party, including the Debtors or the Committee, in connection with (i) the initiation or

prosecution of any claims, causes of action, adversary proceedings, or other litigation against any

of the Secured Lending Entities, including, without limitation, (a) challenging the amount,

validity, extent, perfection, priority, or enforceability of, or asserting any defense, counterclaim,

or offset to the DIP Obligations, DIP Superpriority Claims or security interests and liens of the

DIP Agent or DIP Lenders in respect thereof, (b) challenging the amount, validity, extent,

perfection, priority, or enforceability of, or asserting any defense, counterclaim, or offset to the Prepetition Obligations, Prepetition Superpriority Claims or security interests and liens of the Prepetition Agent or Prepetition Lenders in respect thereof or (ii) asserting any claims or causes of action, including, without limitation, claims or actions to hinder or delay the DIP Agent's or DIP Lenders' assertion, enforcement or realization on the DIP Collateral in accordance with the DIP Facility Documents or this Interim Order; provided, further, however, that no more than $15,000 of the proceeds of the DIP Facility or any proceeds of the DIP Collateral may be used to fund a reasonable investigation by the Committee into the existence of any causes of action or other type of litigation against the Prepetition Secured Entities with respect to the Prepetition Obligations. Notwithstanding the foregoing, so long as a Carve-Out Event has not occurred: (i) the Debtors shall be permitted to pay, subject to and in accordance with the Approved Budget, administrative expenses allowed and payable under sections 330 and 331 of the Bankruptcy Code, as the same may become due and payable; and (ii) such payments shall not be applied to reduce the Carve-Out (to the extent such payments are ultimately permitted by the Court). Nothing contained herein is intended to constitute, nor should be construed as consent to, the allowance of any Professional's fees, costs or expenses by any party and shall not affect the right of the Debtors, DIP Agent, DIP Lenders, Prepetition Agent, Prepetition Lenders, Committee, U.S. Trustee, or any other party-in-interest to object to the allowance and payment or any amounts incurred or requested.

15. <u>Investigation Rights</u>. The Committee shall have a maximum of sixty (60) days from the date of its appointment, but in no event later than seventy-five (75) days from the Petition Date, and in the event no Committee is appointed, all non-debtor parties-in-interest (including a trustee, if appointed or elected prior to the Investigation Termination Date, as

defined herein) shall have seventy-five (75) days from the Petition Date (the "Investigation Termination Date") to investigate the validity, perfection and enforceability of the Prepetition Liens and the Prepetition Obligations, or to assert any other claims or causes of action against the Prepetition Secured Entities. If any Committee, or any non-debtor party-in-interest hereafter vested with authority by this Court, determines that there may be a challenge to the Prepetition Secured Entities by the Investigation Termination Date, then upon three (3) days' written notice to the Debtors and the Prepetition Secured Entities, such Committee or other non-debtor party-in-interest hereafter vested with authority by this Court shall be permitted to file and prosecute an objection or claim related thereto (each, a "Challenge"), and shall have only until the Investigation Termination Date to file such objection or otherwise initiate an appropriate action on behalf of the Debtors' estates setting forth the basis of any such challenge, claim or cause of action. If a Challenge is not filed on or before the Investigation Termination Date: (a) the agreements, acknowledgements and stipulations contained in Paragraph C of this Interim Order, shall be irrevocably binding on the Debtors, the Committee and all parties-in-interest and any and all successors-in-interest as to any of the foregoing, without further action by any party or this Court, and any Committee and any other party-in-interest and any and all successors-in-interest as to any of the foregoing, shall thereafter be forever barred from bringing any Challenge; (b) the liens and security interests of the Prepetition Agent and Prepetition Lenders shall be deemed to constitute valid, binding, enforceable and perfected liens and security interests not subject to avoidance or disallowance pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (c) the Prepetition Indebtedness shall be deemed to be finally allowed claims for all purposes in the Chapter 11 Cases and any subsequent chapter 7 cases, in the amounts set forth in Paragraph C and shall not be subject to challenge by any party-in-interest as

to validity, priority or otherwise; and (d) the Debtors shall be deemed to have released, waived and discharged the Prepetition Secured Entities (whether in their prepetition or postpetition capacity), together with their respective officers, directors, employees, agents, attorneys, professionals, affiliates, subsidiaries, assigns and/or successors, from any and all claims and causes of action arising out of, based upon or related to, in whole or in part, the Prepetition Obligations. The Prepetition Agent shall cooperate in all reasonable requests for information in order to assist the Committee in its investigation under this Paragraph 15. Notwithstanding anything to the contrary herein: (a) if any such Challenge is timely commenced, the stipulations contained in Paragraph C of this Interim Order shall nonetheless remain binding on all parties-in-interest and preclusive except to the extent that such stipulations are expressly and successfully challenged in such Challenge; and (b) the Prepetition Secured Entities reserve all of their rights to contest on any grounds any Challenge.

16. <u>Protection of DIP Lenders' Rights</u>. So long as there are any DIP Revolving Loans, DIP Roll-Up Loans or other amounts outstanding, the DIP Lenders have any Commitment (as defined in the DIP Agreement) under the DIP Agreement or any other DIP Obligations are outstanding, the Prepetition Secured Entities (i) shall not take any action to foreclose upon or recover in connection with their respective liens and security interests, other agreements, or operation of law of this Interim Order, or otherwise exercise remedies against any DIP Collateral, except to the extent authorized by an order of this Court, (ii) shall be deemed to have consented to any release of DIP Collateral authorized under the DIP Facility Documents, (iii) shall not file any further financing statements, trademark filings, copyright filings, patent filings, mortgages, notices of lien or similar instruments, enter into any control agreement, or otherwise take any action to perfect their security interests in the DIP Collateral unless, solely as

to this clause (iii), the DIP Agent files financing statements or other documents to perfect the liens granted pursuant to this Interim Order, or as may be required by applicable state law to continue the perfection of valid and unavoidable liens or security interests as of the Petition Date and (iv) not seek to terminate or modify the use of Cash Collateral.

17.     Asset Dispositions.  The Debtors shall immediately pay, or cause to be paid to, the DIP Agent for application to the DIP Obligations, to the extent required by and in the order set forth in the DIP Agreement, all of the proceeds of any sale, lease or other disposition of any DIP Collateral outside of the ordinary course of business (an "Asset Disposition") and shall comply with all other provisions in the DIP Facility Documents and this Interim Order in connection with any such Asset Disposition.  Except to the extent otherwise expressly provided in the DIP Facility Documents, the Debtors shall not sell or otherwise dispose of any DIP Collateral outside the ordinary course of business without the prior written consent of the DIP Agent and the number and/or percentage of DIP Lenders required pursuant to the DIP Agreement and order of the Court after notice and a hearing.  The rights of the DIP Agent, the DIP Lenders, the Prepetition Agent and the Prepetition Lenders to credit bid all or any portion of their Indebtedness in connection with any proposed Asset Disposition of DIP Collateral (other than the sale of the Debtors' inventory in the ordinary course of Debtors' business) shall be preserved through the closing of such sale.  All proceeds of any Asset Disposition shall be applied in accordance with the terms and conditions of the DIP Agreement.

18.     Further Assurances.  The Debtors shall execute and deliver to the DIP Agent, DIP Lenders, Prepetition Agent and the Prepetition Lenders all such agreements, financing statements, instruments and other documents as the DIP Agent, DIP Lenders Prepetition Agent or the Prepetition Lenders may reasonably request to evidence, confirm,

validate or perfect the DIP Liens or the Adequate Protection Liens granted pursuant hereto. Further, the Debtors are authorized and directed to do and perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the execution of additional security agreements, pledge agreements, control agreements, mortgages and financing statements), and shall pay fees and expenses that may be required or necessary for the Debtors' performance under the DIP Facility Documents, including, without limitation, (i) the execution of the DIP Facility Documents and (ii) the payment of the fees, costs and other expenses described in the DIP Facility Documents as such become due. None of the reasonable attorneys', financial advisers' and accountants' fees and disbursements incurred by the DIP Agent or DIP Lenders and reimbursable by the Debtors shall be subject to the approval of this Court or the U.S. Trustee guidelines, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with this Court. Notwithstanding the foregoing, the Debtors shall, promptly after payment of invoices for any such fees and disbursements, provide copies of same to counsel for the Prepetition Agent. In addition, the Debtors are hereby authorized and directed to indemnify the DIP Agent and DIP Lenders against any liability arising in connection with the DIP Facility Documents to the extent provided in the DIP Facility Documents. All such fees, expenses and indemnities of the DIP Agent and DIP Lenders shall constitute DIP Obligations and shall be secured by the DIP Liens and afforded all of the priorities and protections afforded to the DIP Obligations under this Interim Order and the other DIP Facility Documents.

19.     506(c) Waiver. Upon the entry of the Final Order, the Debtors shall irrevocably waive and shall be prohibited from asserting any surcharge claim, under section 506(c) of the Bankruptcy Code or otherwise, for any costs and expenses incurred in connection

with the preservation, protection or enhancement of, or realization by the Secured Lending Entities upon the DIP Collateral or the Prepetition Collateral (as applicable). In no event shall the Secured Lending Entities be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to the DIP Collateral or the Prepetition Collateral (as applicable).

20.    Restrictions on Granting Post-Petition Liens. Other than the Carve-Out, or as otherwise provided in this Interim Order, no claim having a priority superior or *pari passu* with those granted by this Interim Order to the Secured Lending Entities shall be granted or permitted by any order of this Court heretofore or hereafter entered in the Chapter 11 Cases, while (i) any portion of the DIP Facility (or refinancing thereof), any DIP Revolving Loan, any DIP Roll-Up Loan or any other DIP Facility Obligations are outstanding or (ii) the DIP Lenders have any Commitment (as defined in the DIP Agreement) under the DIP Agreement. Except as expressly permitted by the DIP Facility Documents, the Debtors will not, at any time during the Chapter 11 Cases, grant mortgages, security interests or liens in the DIP Collateral (or any portion thereof) to any other parties pursuant to section 364(d) of the Bankruptcy Code or otherwise.

21.    Return of Inventory. The Debtors shall not, without the consent of the DIP Agent, DIP Lenders, Prepetition Agent and Prepetition Lenders: (i) enter into any agreement to return any inventory to any of their creditors for application against any prepetition indebtedness under section 546(h) of the Bankruptcy Code; or (ii) consent to any creditor taking any set-off against any of its prepetition indebtedness based upon any such return pursuant to section 553(b)(1) of the Bankruptcy Code or otherwise.

22.    Automatic Effectiveness of Liens. The DIP Liens and Adequate Protection Liens shall not be subject to challenge and shall attach and become valid, perfected,

enforceable, non-avoidable and effective by operation of law as of the Petition Date without any further action by the Debtors, the Secured Lending Entities and without the necessity of execution by the Debtors, or the filing or recordation, of any financing statements, security agreements, vehicle lien applications, mortgages, filings with the U.S. Patent and Trademark Office or the Library of Congress, or other documents or the taking of any other actions. All DIP Collateral shall be free and clear of other liens, claims and encumbrances, except as provided in the DIP Facility Documents and this Interim Order. If the DIP Agent or the Prepetition Agent hereafter requests that the Debtors execute and deliver to the DIP Agent or the Prepetition Agent financing statements, security agreements, collateral assignments, mortgages, or other instruments and documents considered by such agent to be reasonably necessary or desirable to further evidence the perfection of the DIP Liens or the Adequate Protection Liens, as applicable, the Debtors are hereby authorized and directed to execute and deliver such financing statements, security agreements, mortgages, collateral assignments, instruments, and documents, and the DIP Agent or the Prepetition Agent is hereby authorized to file or record such documents in its discretion without seeking modification of the automatic stay under section 362 of the Bankruptcy Code, in which event all such documents shall be deemed to have been filed or recorded at the time and on the date of entry of this Interim Order.

23.   <u>Automatic Stay</u>. As provided herein, subject only to the provisions of the DIP Agreement and without further order from this Court, the automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit the DIP Agent and DIP Lenders to exercise, upon the occurrence and during the continuance of any Event of Default, all rights and remedies provided for in the DIP Facility Documents, and to take any or all of the following actions, so long as the DIP Agent has provided three (3) business

days prior written notice to the Debtors, their bankruptcy counsel, counsel to the Committee, counsel to the respective Secured Lender Entities and the U.S. Trustee as provided for in Section 11.12 of the DIP Agreement: (a) immediately terminate the Debtors' use of Cash Collateral and cease making any advances under the DIP Revolving Loans to the Debtors; (b) declare all DIP Obligations to be immediately due and payable; (c) charge the default rate of interest provided for under the DIP Agreement; (d) freeze monies or balances in the Debtors' accounts; (e) immediately set off any and all amounts in accounts maintained by the Debtors with the DIP Agent or any of the DIP Lenders against the DIP Obligations, or otherwise enforce rights against the DIP Collateral in the possession of any of the DIP Lenders for application towards the DIP Obligations; and (f) take any other actions or exercise any other rights or remedies permitted under this Interim Order, the DIP Facility Documents or applicable law to effect the repayment of the DIP Obligations. Following the giving of written notice by the DIP Agents of the occurrence of an Event of Default, the Debtors and any Committee in the Cases shall be entitled to an emergency hearing before this court solely for the purpose of contesting whether an Event of Default has occurred. Upon entry of this Interim Order, no party-in-interest shall have the right to contest the enforcement of the remedies set forth in this Interim Order and the DIP Facility Documents on any basis other than an assertion that no Event of Default has occurred, and, except with respect to such an assertion, no party-in-interest shall have the right to enjoin any such enforcement under section 105 of the Bankruptcy Code or otherwise, or to seek any injunctive relief inconsistent with the provisions of this Interim Order or the DIP Facility Documents. The rights and remedies of the DIP Agent and DIP Lenders specified herein are cumulative and not exclusive of any rights or remedies that the DIP Agent and DIP Lenders may have under the DIP Facility Documents or otherwise. The Debtors shall cooperate fully with the

DIP Agent and DIP Lenders in their exercise of rights and remedies, whether against the DIP Collateral or otherwise. This Court shall retain exclusive jurisdiction to hear and resolve any disputes and enter any orders required by the provisions of this paragraph and relating to the application, re-imposition or continuance of the automatic stay as provided hereunder.

24. <u>Limitations in Respect of the DIP Roll-Up Loans</u>. The DIP Roll-Up Loans may not be required to be repaid in cash on the Maturity Date (as defined in the DIP Agreement), provided that the Debtors shall use reasonable endeavors to procure the same. Any repayment of a DIP Revolving Loan will not reduce the amount of the outstanding DIP Roll-Up Loans. Upon the vote of the DIP Roll-Up Loan class to accept a chapter 11 plan in accordance with section 1126 of the Bankruptcy Code or, failing to obtain same, pursuant to section 1129(b) of the Bankruptcy Code, the Debtors' chapter 11 plan of reorganization may require that the DIP Roll-Up Loans be refinanced or otherwise replaced with other securities or financial instruments with a present value equal to the accrued principal and interest due in respect of the DIP Roll-Up Loans as of the effective date of the plan; <u>provided</u> that the relative lien position of the DIP Lenders under the DIP Revolving Loans in respect of the DIP Roll-Up Loans is maintained; and <u>provided further</u>, the relative position of the DIP Lenders under the DIP Roll-Up Loans in respect of the Prepetition Obligations is maintained. Upon conversion of the DIP Roll-Up Loans in connection with the funding of the Revolving Loans, the DIP Roll-Up Loans shall cease to be Prepetition Indebtedness and shall be deemed DIP Obligations in all respects including for purposes of having the benefit of Section 364(e) of the Bankruptcy Code.

25. <u>Binding Effect</u>. The provisions of this Interim Order shall be binding upon and inure to the benefit of the Secured Lending Entities, the Debtors, any Committee appointed in these Cases, and their respective successors and assigns (including any chapter 7 or

chapter 11 trustee hereinafter appointed or elected for the estate of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors). To the extent permitted by applicable law, this Interim Order shall bind any trustee hereafter appointed for the estate of any of the Debtors, whether in these Chapter 11 Cases or in the event of the conversion of any of the Chapter 11 Cases to a liquidation under chapter 7 of the Bankruptcy Code. Such binding effect is an integral part of this Interim Order.

26. <u>Survival</u>. The provisions of this Interim Order and any actions taken pursuant hereto shall survive the entry of any order: (i) confirming any plan of reorganization in any of the Chapter 11 Cases (and, to the extent not satisfied in full in cash, the DIP Obligations shall not be discharged by the entry of any such order, pursuant to section 1141(d)(4) of the Bankruptcy Code, each of the Debtors having hereby waived such discharge); (ii) converting any of the Chapter 11 Cases to a chapter 7 case; or (iii) dismissing any of the Chapter 11 Cases, and the terms and provisions of this Interim Order as well as the DIP Superpriority Claims and the DIP Liens in the DIP Collateral granted pursuant to this Interim Order and the DIP Facility Documents (and with respect to the entry of any order as set forth in (ii) or (iii) herein, the Adequate Protection Liens and Prepetition Superpriority Claims) shall continue in full force and effect notwithstanding the entry of any such order. Such claims and liens shall maintain their priority as provided by this Interim Order and the DIP Facility Documents, and to the maximum extent permitted by law, until all of the DIP Obligations are indefeasibly paid in full and discharged. In no event shall any plan of reorganization be allowed to alter the terms of repayment of any of the DIP Obligations from those set forth in the DIP Facility Documents.

27.   Modifications of DIP Facility Documents.  The Debtors, DIP Agent and DIP Lenders are hereby authorized to implement, in accordance with the terms of the DIP Facility Documents, any non-material modifications (including without limitation, any change in the number or composition of the DIP Lenders) of the DIP Facility Documents without further Order of this Court, or any other modifications to the DIP Facility Documents; provided, however, that notice of any material modification or amendment to the DIP Facility Documents shall be provided to counsel to any Committee, to the U.S. Trustee, Prepetition Agent, each of whom shall have three (3) days from the date of such notice within which to object in writing to such modification or amendment.  If any Committee or the U.S. Trustee timely objects to any material modification or amendment to the DIP Facility Documents, such modification or amendment shall only be permitted pursuant to an order of this Court.

28.   Insurance Policies.  Upon entry of this Interim Order, the DIP Agent and DIP Lenders shall be, and shall be deemed to be, without any further action or notice, named as additional insureds and loss payees, as applicable, on each insurance policy maintained by the Debtors which in any way relates to the DIP Collateral.  The Debtors are authorized and directed to take any actions necessary to have the DIP Agent, on behalf of the DIP Lenders, be added as an additional insured and loss payee on each insurance policy.

29.   Restriction on Use of DIP Lenders' Funds.  None of the Debtors shall be permitted to use the proceeds of the DIP Revolving Loans: (a) for the payment of interest and principal with respect to any indebtedness that is subordinated to the DIP Facility except as expressly set forth herein, (b) to finance in any way any adversary action, suit, arbitration, proceeding, application, motion, other litigation, examination or investigation of any type relating to or in connection with the DIP Facility Documents, including, without limitation, any

challenges to the Prepetition Obligations, or the validity, perfection, priority, or enforceability of any Prepetition Lien securing such claims or any payment made thereunder, (c) to finance in any way any action, suit, arbitration, proceeding, application, motion, other litigation, examination or investigation of any type adverse to the interests of the DIP Agents and the DIP Lenders or their rights and remedies under the DIP Agreement, the other DIP Facility Documents, this Interim Order or the Final Order without the prior written consent of the DIP Agent, (d) to make any distribution under a plan of reorganization in any Chapter 11 Case, and (e) to make any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body without the prior written consent of the DIP Agent. Notwithstanding anything herein to the contrary, for so long as the Debtors are authorized to use the Prepetition Lenders' Cash Collateral with the consent of the Prepetition Lenders, no Cash Collateral of the Prepetition Lenders may be used directly or indirectly by any of the Debtors, any Committee or any other person or entity to object to or contest in any manner the Prepetition Obligations or Prepetition Liens, or to assert or prosecute any actions, claims or causes of action against any of the Prepetition Agents or Prepetition Lenders without the consent of the applicable Prepetition Agents and Prepetition Lenders.

30. <u>Release of Claims and Defenses.</u> Each Debtor hereby releases and discharges the DIP Agent, the DIP Lenders, the Prepetition Agent and the Prepetition Lenders, together with their respective affiliates, agents, attorneys, officers, directors and employees (collectively, the *"Released Parties"*), from any and all claims and causes of action arising out of, based upon or related to, in whole or in part, any of the Prepetition Facility Documents or the DIP Facility Documents, any aspect of the prepetition relationship between the Debtors, on the one hand, and any or all of the Released Parties, on the other hand, relating to any of the

Prepetition Facility Documents or the DIP Facility Documents or any transaction contemplated thereby or any other acts or omissions by any or all of the Released Parties in connection with any of the Prepetition Facility Documents or the DIP Facility Documents or their pre-petition relationship with such Debtor or any Affiliate thereof relating to any of the Prepetition Facility Documents or the Postpetition Facility or any transaction contemplated thereby, including, without limitation, any claims or defenses as to the extent, validity, priority, or enforceability of the Prepetition Liens or the Prepetition Obligations, any claims or defenses under chapter 5 of the Bankruptcy Code or any other causes of action (collectively, the "*Claims and Defenses*").

31. <u>Protection Under Section 364(e)</u>. If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacation or stay shall not affect the (i) validity of any DIP Obligations, or Adequate Protection Obligations owing to the Prepetition Secured Entities incurred prior to the actual receipt by the DIP Agent or Prepetition Agent, as applicable, of written notice of the effective date of such reversal, modification, vacation or stay, or (ii) validity or enforceability of any claim, lien, security interest or priority authorized or created hereby or pursuant to the DIP Facility Documents with respect to any DIP Obligations, or Adequate Protection Obligations owing to the Prepetition Secured Entities. Notwithstanding any such reversal, modification, vacation or stay, any use of Cash Collateral or the incurrence of DIP Obligations, or Adequate Protection Obligations owing to the Prepetition Secured Entities by the Debtors prior to the actual receipt by the DIP Agent or Prepetition Agent, as applicable, of written notice of the effective date of such reversal, modification, vacation or stay, shall be governed in all respects by the provisions of this Interim Order, and the Secured Lending Entities shall be entitled to all of the rights, remedies, protections and benefits granted under section 364(e) of the Bankruptcy Code, this

Interim Order, and the DIP Facility Documents with respect to all uses of Cash Collateral and the incurrence of DIP Obligations, and Adequate Protection Obligations owing to the Prepetition Secured Entities.

32. _Effect of Dismissal of Chapter 11 Cases_. If the Chapter 11 Cases are dismissed, converted or substantively consolidated, then neither the entry of this Interim Order nor the dismissal, conversion or substantive consolidation of these Chapter 11 Cases shall affect the rights of the Secured Lending Entities under their respective DIP Facility Documents, Prepetition Facility Documents or this Interim Order, and all of the respective rights and remedies thereunder of the Secured Lending Entities shall remain in full force and effect as if the Chapter 11 Cases had not been dismissed, converted, or substantively consolidated. If an order dismissing any of the Chapter 11 Cases is at any time entered, such order shall provide (in accordance with Sections 105 and 349 of the Bankruptcy Code) that: (i) the DIP Liens and DIP Superpriority Claims granted to and conferred upon the DIP Agent and DIP Lenders and the protections afforded to the DIP Agent and/or the DIP Lenders pursuant to this Interim Order and the DIP Facility Documents shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all DIP Obligations shall have been paid and satisfied in full (and that such DIP Liens, DIP Superpriority Claims and other protections shall, notwithstanding such dismissal, remain binding on all interested parties); (ii) those primed or unprimed (as the case may be) Prepetition Liens, Adequate Protection Liens and Prepetition Superpriority Claims granted to and conferred upon the Prepetition Agent and Prepetition Lenders shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all Prepetition Indebtedness shall have been paid and satisfied in full (and that such Prepetition Superpriority Claims shall, notwithstanding such dismissal, remain

binding on all interested parties); (iii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purpose of enforcing the DIP Liens, Prepetition Liens, DIP Superpriority Claims and Prepetition Superpriority Claims referred to herein; and (iv) the effectiveness of any order dismissing the Chapter 11 Cases shall not occur until sixty (60) days after it is entered in order to give the Secured Lending Entities the opportunity to perfect their respective security interests and liens in the collateral under non-bankruptcy law, including, without limitation, the filing or recording of financing statements, mortgages, deeds of trust, security deeds, leasehold mortgages, notices of lien or similar instruments in any jurisdiction (including trademark, copyright, tradename or patent assignment filings with the United States Patent and Trademark Office, Copyright Office or any similar United States entity) and the procurement of waivers from any landlord, tenant, mortgagee, bailee or warehouseman and consents from any licensor or similar party-in-interest.

33.  <u>Findings of Fact and Conclusions of Law</u>.  This Interim Order constitutes, where applicable, findings of fact and conclusions of law and shall take effect and be fully enforceable immediately upon the execution thereof.

34.  <u>Choice of Law; Jurisdiction</u>.  The DIP Facility and the DIP Facility Documents (and the rights and obligations of the parties thereto) shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York, including, without limitation, Sections 5-1401 and 5-1402 of the New York General Obligations Law, and, to the extent applicable, the Bankruptcy Code.  The Bankruptcy Court shall have exclusive jurisdiction with respect to any and all disputes or matters under, or arising out of or in connection with, either the DIP Facility or the DIP Facility Documents.

35. <u>Authorized Signatories</u>. The signature of any Authorized Officer (as defined in the Debtor's corporate resolutions filed with the Petition) or Debtors' attorneys, appearing on any one or more of the DIP Facility Documents shall be sufficient to bind the Debtors. No board of directors or other approval shall be necessary.

36. <u>Order Effective</u>. This Interim Order shall be effective as of the date of the signature by the Court.

37. <u>No Requirement to Accept Title to Collateral</u>. The Prepetition Agent, the Prepetition Lenders, the DIP Agent and the DIP Lenders shall not be obligated to accept title to any portion of the Prepetition Collateral or DIP Collateral in payment of the indebtedness owed to such party by the Debtors, in lieu of payment in cash or cash equivalents, nor shall any of the Prepetition Agent, Prepetition Lenders, DIP Agent or DIP Lenders be obligated to accept payment in cash or cash equivalents that is encumbered by any interest of any person or entity other than the Prepetition Agent, Prepetition Lenders, DIP Agent or DIP Lenders.

38. <u>Controlling Effect of Interim Order</u>. To the extent any provision of this Interim Order conflicts with any provision of the Motion, any prepetition agreement or any DIP Facility Document, the provisions of this Interim Order shall control.

39. <u>Final Hearing</u>. A final hearing on the Motion shall be heard before this Court on July ___, 2009 at _____ a.m. in Courtroom ____ at the United States Bankruptcy Court, 824 Market Street, Wilmington, DE 19801.

Dated: May ___, 2009.

_____
United States Bankruptcy Judge

# SCHEDULE A

# DIP Term Sheet

---

## TERM SHEET

### Pacific Ethanol Holding Co. LLC and its debtor affiliates

### Debtor-in-Possession Credit Facility

*The terms and conditions summarized below are intended as a summary outline of a financing commitment which is conditioned in all respects upon completion of due diligence, negotiation of definitive documentation and final credit approval and do not purport to summarize all of the conditions, covenants, representations, warranties and other provisions which would be contained in definitive documentation.[1] No DIP Lender (as defined herein) is under any obligation to make a loan or make any commitment to lend and any such commitment would be subject to, among other conditions, such DIP Lender obtaining any necessary authorizations and approvals and negotiation and execution of definitive documentation in form and substance satisfactory to such DIP Lender. This document is delivered to you with the understanding that neither it nor its substance shall be disclosed to any third party. Any provision of financial accommodations under such debtor-in-possession credit facility shall be further subject to the terms and conditions and Bankruptcy Court approval as set forth below.*

*Capitalized terms not defined herein shall have the meaning ascribed to such terms in the Credit Agreement dated as of February 27, 2007 (as amended, supplemented or otherwise modified from time to time, the "Prepetition Credit Agreement"), among Pacific Ethanol Holding Co. LLC ("Holding"), Pacific Ethanol Madera LLC ("Madera"), Pacific Ethanol Columbia, LLC ("Columbia"), Pacific Ethanol Stockton, LLC ("Stockton"), Pacific Ethanol Magic Valley, LLC ("Magic Valley"), WestLB AG, New York Branch ("WestLB"), as administrative agent and collateral agent (collectively, the "Prepetition Agent"), Amarillo National Bank, as accounts bank ("Accounts Bank"), and the lenders signatory thereto (the "Prepetition Lenders").*

## I. General Terms

| | |
|---|---|
| **Borrowers:** | Holding, Columbia, Madera, Stockton and Magic Valley, each of which will be a debtor and debtor-in-possession (in such capacity, each a "Borrower" and collectively, the "Borrowers") in cases to be commenced in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") under chapter 11 ("Chapter 11") of Title 11 of the United States Code (the "Bankruptcy Code") The cases of the Borrowers are each referred to as a "Chapter 11 Case" and are collectively referred to as the "Chapter 11 Cases", and the date the cases are commenced is referred to as the "Petition Date". The obligations of the Borrowers under the DIP Facilities shall be joint and several. |
| **DIP Lender(s):** | WestLB and together with any person who shall become a lender under |

---

[1] Note that to the extent the terms of a consensual restructuring of the Borrowers are agreed upon among the parties, the terms herein may be subject to modification.

the DIP Facility (collectively with WestLB, the "DIP Lenders").

**DIP Agent:** WestLB, in such capacity as DIP Agent.

**DIP Facility:** The total senior secured first priority DIP facility (the "DIP Facility") shall include: (x) Loans to be advanced and made available to the Borrowers (the "Advances") under a revolving credit facility (the "DIP Revolving Loans") in the aggregate maximum principal amount of $20.0 million (the "Revolving Commitment") and (y) a 1:50:1.00 conversion of $30.0 million (the "Roll-Up Amount" and together with the Revolving Commitment, the "DIP Commitment") in respect of outstanding term loans under the Prepetition Credit Facility beneficially owned by the DIP Lenders (or an affiliate) at the Closing Date (the "Roll-Up Loans"). The Roll-Up Amount will be calculated on a basis of one and one-half dollars of Roll-Up Loans for each dollar of DIP Revolving Loans provided by the DIP Lenders.

An amount of approximately $10.0 million (the "Interim Advance") of DIP Revolving Loans, approved by the Bankruptcy Court in the interim order (the "Interim Order") and acceptable to the DIP Agent and the DIP Lenders, shall be made available during the period from the date of entry of the Interim Order by the Bankruptcy Court through the date of entry of the final order (the "Final Order" and together with the Interim Order, the "DIP Orders") by the Bankruptcy Court approving the DIP Facility and the balance of which Revolving Commitments shall be available after entry of the Final Order. Approximately $15.0 million of Roll-Up Loans shall convert concurrently with the funding of the Interim Advance. Pending the entry of the Final Order, the DIP Agent and the DIP Lenders shall be afforded all of the protections contained in the Interim Order, which order shall be in a form and substance in all respects acceptable to the DIP Agent and the DIP Lenders.

The DIP Commitment of each DIP Lender as of the entry date of the Interim Order will be set forth on Annex I hereto.

**Use of Proceeds:** To fund (i) operating expenses, limited capital expenditures and other amounts for general corporate and ordinary course purposes of the Borrowers, all in accordance with the DIP Budget (as defined below), (ii) current interest and fees on the DIP Facility, and (iii) such other administrative payments, including the budgeted professional fees, as may be authorized and approved by the DIP Agent and the DIP Lenders under the DIP Orders or subsequent order of the Bankruptcy Court.

No portion of the DIP Facility, the DIP Collateral (as defined below), including any cash collateral, or the Carve-Out (as defined below) is to be used to (i) challenge the validity, perfection, priority, extent or enforceability of the DIP Facility, the obligations under the Prepetition Credit Agreement (the "Prepetition Obligations"), or the liens on or security interests in the assets of the Borrowers securing the DIP Facility or the Prepetition Obligations or (ii) assert any other claims against the DIP Agent, the DIP Lenders, the Prepetition Lenders, or the Prepetition Agent; provided, however, nothing herein shall be deemed to limit the use of the Advances in respect of any determination under Section 506(a) of

the Bankruptcy Code (a "Section 506(a) Determination").

**Operating Budget:**  The operating budget, subject to the approval of the DIP Agent and the DIP Lenders, to consist of the Borrowers' estimated projected cash flow position on a rolling 13-week basis (the "DIP Budget"), commencing as of the Closing Date (as defined below). Upon approval of DIP Agent and the DIP Lenders of the DIP Budget, any subsequent changes to the DIP Budget may be made only on approval of the DIP Agent and DIP Lenders holding a majority of the outstanding DIP Revolving Loans and DIP Commitments (the "Required DIP Lenders"). The Borrowers will be allowed a 10% variance on the aggregate amounts set forth in the DIP Budget, measured on a rolling four-week basis. DIP Budget shall include monthly reimbursement of the reasonable fees and expenses of the professionals of DIP Agent and DIP Lenders and the Prepetition Agent.

**Maturity:**  The Borrowers shall repay any outstanding advances and loans under the DIP Facility in full in immediately available funds on the Maturity Date, to be defined as the earliest of (i) six (6) months after the Closing Date; (ii) the date of acceleration of any outstanding Extensions of Credit (as defined below) under the DIP Facility; (iii) the first business day on which the Interim Order expires by its terms or is terminated, unless the Final Order shall have been entered and become effective prior thereto; (iv) conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code ("Chapter 7") unless otherwise consented to in writing by the DIP Agent and the DIP Lenders; (v) dismissal of any of the Chapter 11 Cases unless otherwise consented to in writing by the DIP Agent and the DIP Lenders; and (vi) the effective date of any Borrower's plan of reorganization confirmed in the Chapter 11 Cases.

**Interest:**  Interest shall be payable monthly in arrears in cash on the outstanding amount of the DIP Revolving Loans on the first business day of each month at a rate equal to LIBOR + 10 % per annum. LIBOR shall be defined as the greater of (i) 4% per annum and (ii) the offered rate on the applicable page of the Telerate screen (or any successor thereto) that displays an average British Bankers Association Interest Rate Settlement Rate for deposits in U.S. Dollars and shall contain appropriate protection to ensure that such rate is not less than a DIP Lender's cost of funds.

Interest on the Roll-Up Loans shall accrue interest at the predefault rate applicable to the base rate term loans under the Prepetition Credit Agreement.

**Default Interest:**  Upon the occurrence and during the continuance of any event of default under the DIP Facility and at the election of the DIP Lenders, interest to be payable on all outstanding principal or any other obligation under the DIP Facility at 2.0% above the then applicable interest rate.

| | |
|---|---|
| **Closing Date:** | A date on or before May 22, 2009 upon which all Conditions Precedent have been satisfied (the "Closing Date"). |
| **Facility Fee:** | A fee of 2.0% of the Revolving Commitment payable to the DIP Lenders on the Closing Date. |
| **Structuring Fee:** | A fee of 1.0% of the Revolving Commitment payable to the DIP Agent on the Closing Date. |
| **Unused Commitment Fee:** | A fee on the unused portion of the Revolving Commitment of 2.0% per annum, payable monthly. |

## II.  Additional Terms

**Mandatory Prepayments:** Mandatory prepayments (including but not limited to net proceeds from Section 363 asset sales of the Borrowers' assets outside of the ordinary course of business, if any, approved by the DIP Agent and the DIP Lenders and authorized by the Bankruptcy Court and insurance proceeds received by any Borrower as a result of any casualty event) shall be used to prepay all amounts outstanding under the DIP Facility.  Unless agreed to otherwise by the DIP Lenders, prepayments of principal outstanding under the DIP Facility shall permanently reduce the DIP Commitment.

Mandatory prepayments shall be applied, first to the payment of all costs, fees, expenses and indemnities then due and payable to the DIP Lenders (including attorney's and professional's fees); second, to the payment of any accrued and unpaid interest due and payable on the DIP Revolving Loans *pro rata* among the DIP Lenders (other than any DIP Lender that has defaulted on its obligations to advance DIP Revolving Loans (a "Defaulting Lender")) with respect to their respective outstanding principal amounts; third, to the repayment of principal of DIP Revolving Loans (and permanent reduction of the Revolving Commitments associated therewith) *pro rata* among the DIP Lenders (other than the Defaulting Lenders) with respect to their respective outstanding principal amounts until repaid in full; fourth, to the payment of all accrued and unpaid interest then due and payable on the DIP Revolving Loans *pro rata* among the Defaulting Lenders based on their respective outstanding principal amounts on the date of such prepayment; fifth, to the payment of principal of DIP Revolving Loans *pro rata* among the Defaulting Lenders based on their respective outstanding principal amounts on the date of such prepayment; sixth, to the payment of all accrued and unpaid interest due and payable on the Roll-Up Loans pro rata among the DIP Lenders (other than the Defaulting Lenders); seventh, to the payment of the principal of the Roll-Up Loans *pro rata* among the DIP Lenders (other than the Defaulting Lenders) based on their respective outstanding principal amounts on the date of such prepayment and a corresponding reduction in the Roll-Up Loan Commitment; eighth, to the payment of all accrued and unpaid interest then due and

| | |
|---|---|
| | payable on the Roll-Up Loans *pro rata* among the Defaulting Lenders based on their respective outstanding principal amounts on the date of such prepayment; and ninth, to the payment of principal of the Roll-Up Loans *pro rata* among the Defaulting Lenders based on their respective outstanding principal amounts on the date of such prepayment. |
| **Security:** | All obligations of Borrowers under and with respect to the DIP Facility (the "DIP Obligations") to enjoy superpriority administrative expense status under Section 364(c)(1) with priority over all other costs and expenses of the kinds specified in, or ordered pursuant to, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113, 1114 or any other provisions of the Bankruptcy Code, subject to the Carve-Out. |
| | To secure all of the DIP Obligations, DIP Agent, for the benefit of the DIP Lenders, to receive, pursuant to Sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code, the DIP Orders and the definitive DIP Facility loan documents, valid, enforceable, and fully perfected security interests in and liens upon all prepetition and postpetition assets of the Borrowers, whether now existing or hereafter acquired or arising (collectively, the "DIP Collateral"), which liens shall have the priority set forth below. DIP Collateral to include all rights, claims and other causes of action of each Borrower's estate and any other avoidance actions under Chapter 5 of the Bankruptcy Code and the proceeds thereof and property received thereby whether by judgment, settlement or otherwise (collectively, "Avoidance Actions"). |
| | "DIP Collateral" shall also include any and all rents, issues, products, offspring, proceeds and profits generated by any item of DIP Collateral, without the necessity of any further action of any kind or nature by the DIP Lenders or the DIP Agent in order to claim or perfect such rents, issues, products, offspring, proceeds and/or profits. |
| | Liens and security interests with respect to DIP Collateral (the "DIP Liens") not to be subject to challenge and to attach and become valid and perfected upon entry of the Interim Order without the requirement of any further action by DIP Agent or DIP Lenders. DIP Collateral to be free and clear of other liens, claims and encumbrances, except valid, perfected, enforceable and unavoidable liens in existence as of the petition date, if any, and any other Permitted Liens (as defined in the Prepetition Credit Agreement). |
| | The DIP Liens granted to the DIP Lenders with respect to the Roll-Up Loans will be *pari passu* (on a pro rata basis) to the DIP Liens granted to the DIP Lenders with respect to the DIP Revolving Loans. |
| | As used in this Term Sheet, the term "Carve-Out" shall mean the sum of (i) the aggregate amount of any budgeted, accrued but unpaid, professional fees and expenses existing as of the Carve-Out Date (as defined below) of the Borrowers and of the Committee, which fees |

and expenses are approved by the Bankruptcy Court and in compliance with the DIP Budget, <u>plus</u> (ii) those professional fees and expenses of the Borrowers and the Committee incurred after the Carve-Out Date and subsequently allowed by the Bankruptcy Court and in compliance with the DIP Budget in an amount not to exceed $250,000 in the aggregate, <u>plus</u> (iii) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930. Prior to the Carve-Out Date, subject to entry of an appropriate order of the Bankruptcy Court (in form and substance acceptable to the DIP Agent and the DIP Lenders), the Borrowers shall be permitted to use Advances under the DIP Facility to pay compensation and reimbursement of expenses allowed and payable under sections 330 and 331 of the Bankruptcy Code in accordance with the DIP Budget, and the Carve-Out shall not be reduced by the amount of any compensation and reimbursement of expenses paid or incurred (to the extent ultimately allowed by the Bankruptcy Court) prior to the occurrence of the Carve-Out Date; <u>provided, further</u> that following the Carve-Out Date, any amounts paid to professionals by any means will reduce the Carve-Out on a dollar-for-dollar basis; and <u>provided, further</u>, that nothing herein shall be construed to impair the ability of any party to object to any of the fees, expenses, reimbursement, or compensation sought by the professionals retained by the Borrowers or any statutory committee in the Chapter 11 Cases.

"<u>Carve-Out Date</u>" means the date that is the earlier of any Borrower's receipt of a notice of default under the DIP Facility or the Maturity Date.

Neither the Advances under the DIP Facility nor the Carve-Out may be used to challenge the amount, validity, perfection, priority or enforceability of, or assert any defense, counterclaim or offset to the DIP Facility or the Prepetition Credit Agreement, or the security interests and liens securing the DIP Obligations or the Prepetition Obligations with respect thereto or otherwise to litigate against the DIP Agent, the DIP Lenders, the Prepetition Agent or the Prepetition Lenders; <u>provided, however</u>, the foregoing shall not apply to any Advances or Carve-Out that are used for purposes of seeking a Section 506(a) Determination. Notwithstanding the foregoing, the Committee may spend up to an aggregate maximum of $15,000 under the DIP Facility and the Carve-Out to investigate potential claims arising out of, or in connection with, the Prepetition Credit Agreement or the security interests and liens securing the Prepetition Obligations.

**Special Provisions for Roll-Up Loans:**

The Roll-Up Loans may not be required to be repaid in cash on the Maturity Date. Any repayment of a DIP Revolving Loan will not reduce the amount of outstanding Roll-Up Loans. Upon the vote of the Roll-Up Loan class to accept a Chapter 11 Plan in accordance with section 1126 of the Bankruptcy Code, the Borrowers' plan of

reorganization may require that Roll-Up Loans be refinanced or otherwise replaced with other securities or financial instruments with a present value equal to the accrued principal and interest due in respect of the Roll-Up Loans as of the effective date of the plan; provided that the relative lien position of the DIP Lenders under the DIP Revolving Loans in respect of the Roll-Up Loans is maintained, and provided further the relative lien position of the DIP Lenders under the Roll-Up Loans in respect of the Prepetition Obligations is maintained. Upon conversion of the Roll-Up Loans in connection with the funding of the DIP Revolving Loans, the Roll-Up Loans shall cease to be indebtedness under the Prepetition Credit Agreement and shall be deemed DIP Obligations in all respects including for purposes of having the benefit of Section 364(e) of the Bankruptcy Code.

The Interim Order and the Final Order shall contain provisions prohibiting the Borrowers from incurring any indebtedness which (x) ranks *pari passu* with or senior to the loans under the DIP Facility or (y) benefits from a first or second priority lien under section 364 of the Bankruptcy Code.

**Adequate Protection:**    As adequate protection to the Prepetition Lenders for any diminution in the value of their interests in the Borrowers' property resulting from (i) the priming liens granted in favor of the DIP Agent and the DIP Lenders under the DIP Facility pursuant to section 364(d)(1) of the Bankruptcy Code, (ii) the use, sale or lease of the Borrowers' property (including any cash collateral) pursuant to section 363(c) of the Bankruptcy Code and (iii) the imposition of the automatic stay pursuant to section 362(a) of the Bankruptcy Code:

(a) The Prepetition Lenders will, subject to the terms of any DIP Order, maintain any of their liens in existence on the Petition Date (the "Prepetition Liens") on the DIP Collateral, which liens shall be junior and subordinate to the DIP Liens and the Carve-Out;

(b) The Prepetition Agent, on behalf of the Prepetition Lenders, shall be granted replacement liens on, and security interests in, all of the DIP Collateral (the "Lien Replacement Liens"), which replacement liens shall be subject only to (1) the liens on, and security interests in, the DIP Collateral granted to the DIP Agent and the DIP Lenders under the DIP Facility and the DIP Orders, as the case may be, (2) any Permitted Liens (as defined in the Prepetition Credit Agreement) and (3) the Carve-Out;

(c) Pursuant to Section 507(b) of the Bankruptcy Code, the Prepetition Agent, on behalf of the Prepetition Lenders, shall be granted an administrative claim with priority over all administrative expense claims and unsecured claims against the Borrowers (the "507(b) Claim"), subject only to (1) the super-priority claims granted to the DIP Agent and the DIP Lenders under the DIP Facility and the DIP Orders, as the case may be, and (2) the Carve-Out; and

(d) As additional adequate protection, the Borrowers shall reimburse the Prepetition Lenders on a monthly basis for the reasonable professional fees and expenses of the Prepetition Agent otherwise permitted under the Prepetition Credit Agreement arising (i) before the Petition Date and (ii) after the Petition Date to the extent such amounts arise in connection with the enforcement of the protections granted to the Prepetition Lenders pursuant to the DIP Orders; provided, however, if and to the extent that any payment(s) is challenged by a party in interest under section 506(b) of the Bankruptcy Code and ultimately not allowed under such provision, such payment(s) may be recharacterized as a payment of principal on the Prepetition Obligations.

Notwithstanding the foregoing, the Prepetition Agent and the Prepetition Lenders shall be granted adequate protection as provided herein to the extent the Prepetition Liens are valid, enforceable, perfected and non-avoidable.

|  |  |
|---|---|
| **Representations and Warranties:** | The documentation for the DIP Facility and related collateral matters shall contain such representations and warranties as are customary for DIP loan transactions and investments of a similar size and nature consistent with the Prepetition Credit Agreement. |
| **Financial Covenants:** | Amounts disbursed pursuant to category of DIP Budget entitled "Asset Management Agreement" (excluding the line item entitled "Asset Management Fee") in any monthly budget period not to exceed the amounts set forth in the line item therefor (excluding "Asset Management Fee") in the Initial DIP Budget by more than ten percent (10%) for such monthly budget period. |
|  | Professional fees (other than fees and expenses of the advisors and consultants working on behalf of the DIP Agent and DIP Lenders) in any period of time measured from the Petition Date not to exceed the amounts set forth in the line item entitled "Total Professional Fees & Administrative Expenses" (excluding "Legal Advisors – DIP Lenders" and "Financial Advisors – DIP Lenders") for such period of time in the Initial DIP Budget by more than three hundred thousand Dollars ($300,000). |
|  | Amounts disbursed pursuant to the category in the DIP Budget entitled "Operating Disbursements" in any monthly budget period not exceed the amounts set forth in the line item "Total Operating Disbursements" for such monthly budget period in the then applicable DIP Budget by more than ten percent (10%). |
| **Negative Covenants:** | The documentation for the DIP Facility shall contain negative covenants of each Borrower customary for DIP loan transactions and investments of a similar size and nature consistent with the Prepetition Credit Agreement. |
| **Affirmative Covenants:** | The documentation for the DIP Facility shall include affirmative covenants of each Borrower, customary for DIP loan transactions and investments of a similar size and nature consistent with the |

Prepetition Credit Agreement, including, but not limited to, covenants requiring each Borrower:

1. To provide or cause to be provided to the DIP Agent and the DIP Lenders with a weekly line-by-line variance report comparing actual cash receipts and disbursements on a consolidated basis to amounts projected in the DIP Budget and a weekly reconciliation report which compares the actual cash flow results (receipts and disbursements) against the prior week's cash flow projections (receipts and disbursements), indicating the cumulative percentage variance, if any, of actual results versus projections for such week as set forth therein, together with management's explanation for such variance; such variance not to exceed 10% in the aggregate; and

2. To comply at all times with the DIP Budget (subject to expense variances no greater than 10% in the aggregate).

3. To maintain its existence and take all necessary and appropriate actions to preserve all assets of such Borrower (except as contemplated by the documentation for the DIP Facility.

**Events of Default:**  The DIP Facility shall include Events of Default customary for DIP loan transactions and investments of a similar size and nature consistent with the Prepetition Credit Agreement, including, but not limited to:

1. The use of proceeds inconsistent with the DIP Budget, including;

2. The payment of claims existing prior to the Petition Date or prior to a confirmed plan of reorganization (other than as set forth in the DIP Budget or payment is approved by the DIP Agent and authorized by an Order of the Court);

3. The Asset Management Agreement shall be terminated because of a breach by Pacific Ethanol, Inc. ("PEI");

4. Dismissal or conversion to Chapter 7 of any of the Chapter 11 Cases without the written consent of the DIP Agent and the DIP Lenders or the appointment of a trustee or examiner in any of the Chapter 11 Cases with any powers to operate or manage the financial affairs of any Borrower;

5. The entry of a final order that, in the sole determination of the DIP Agent and the DIP Lenders, in any way modifies, stays, reverses, or vacates the DIP Orders or the DIP Facility in each case in a manner adverse to the DIP Agent and the DIP Lenders without the written consent of DIP Agent and the DIP Lenders or either of the DIP Orders or the DIP

Facility ceases to be in full force and effect;

6. The entry of the Interim Order shall not have occurred within 10 days after the Petition Date;

7. The entry of the Final Order shall not have occurred within 45 days after the date of entry of the Interim Order;

8. Any Borrower petitions the Bankruptcy Court to obtain additional financing *pari passu* or senior to DIP Facility;

9. The entry of an order granting any other super-priority claim or lien equal or superior to that granted to the DIP Agent or the DIP Lenders on the assets of the Borrowers;

10. The entry of an order granting relief from the automatic stay so as to allow a third party to proceed against any material assets of the Borrowers;

11. The entry of any order of the Bankruptcy Court confirming any plan of reorganization that does not contain a provision for termination of the DIP Facility and repayment in full in cash of all of the DIP Obligations under the DIP Facility on or before the effective date of such plan;

12. Any Borrower violates or breaches the any DIP Order or files any pleadings seeking, joining in, or otherwise consenting to any violation or breach of any DIP Order in each case in a manner adverse to the DIP Agent and the DIP Lenders in the sole determination of the DIP Agent and the DIP Lenders;

13. (A) The Borrowers engage in or support any challenge to the validity, perfection, priority, extent or enforceability of the DIP Facility or the Prepetition Obligations or the liens on or security interests in the assets of the Borrowers securing the DIP Facility or the Prepetition Obligations, including without limitation seeking to equitably subordinate or avoid the liens securing the Prepetition Obligations, or (B) the Borrowers engage in or support any investigation or their assertion of any claims or causes of action (or supporting the assertion of the same) against the DIP Agent, the DIP Lenders, the Prepetition Agent or the Prepetition Lenders; provided, however, it shall not constitute an Event of Default if the Borrowers provides basic loan information with respect to the Prepetition Obligations to a party in interest or is compelled to provide information by an Order of the Court and provides prior written notice to the DIP Agent and the DIP Lenders of the intention or requirement to do so;

14. Any person shall seek a Section 506(a) Determination with respect to the Prepetition Obligations that is unacceptable to the Prepetition Agent and the Prepetition Lenders;

15. The allowance of any claim or claims under Section 506(c)

*Pacific Ethanol DIP Credit Facility*
*Term Sheet 5/17/09*

or 552(b) of the Bankruptcy Code against or with respect to any of the collateral securing the DIP Facility;

16. The entry of an order extending any exclusive right that any of the Borrowers may have to propose a plan that is more than 120 days after the Petition Date, or to solicit votes or to seek confirmation of plan on a date more than 180 days after the Petition Date, in either case without the written consent of the DIP Agent and the DIP Lenders;

17. The use of cash collateral other than as expressly contemplated by the DIP Orders and the DIP Budget prior to the indefeasible payment in full of the DIP Obligations and termination of the DIP Commitments thereunder;

18. The consummation of the sale of any material portion of the Borrowers' assets unless consented to by the DIP Agent and the DIP Lenders; and

19. Breach of any covenants or representations and warranties in the DIP financing documents or the DIP Orders, including without limitation, failure to make any Mandatory Prepayments.

**Remedies On Default:** The DIP Orders and the DIP Facility loan documentation to provide that, upon the occurrence and during the continuation of an Event of Default under the DIP Facility, the DIP Agent, at the direction of the DIP Lenders, shall have customary remedies, including, without limitation, the automatic stay under section 362 of the Bankruptcy Code shall be deemed automatically terminated without further order of the Bankruptcy Court and without the need for filing any motion for relief from the automatic stay or any other pleading, to: (i) declare the principal of and accrued interest on the outstanding borrowings to be immediately due and payable, (ii) accelerate the DIP Obligations and terminate, as applicable, any further commitment to lend to the Borrowers, and (iii) charge the default rate of interest on the DIP Facility.

In addition, upon three business days' written notice (the "Notice Period") to the Borrowers and counsel to any official committees and the Office of the U.S. Trustee, the automatic stay shall be deemed automatically terminated, without further order of the Bankruptcy Court and without the need for filing any motion for relief from the automatic stay or any other pleading, to permit the DIP Agent to realize on all Collateral and to exercise any and all remedies under the DIP Orders and the DIP Facility with respect to the Collateral or any part thereof and to set off or seize amounts in any accounts maintained with or under the control of the DIP Agent or any DIP Lender; provided, however, during the Notice Period, Borrowers and/or the Committee may seek relief from the Bankruptcy Court to re-impose or continue the automatic stay; provided, further, in any hearing after the giving of the aforementioned notice, the only issue

that may be raised by any party in opposition thereto being whether, in fact, an Event of Default has occurred and is continuing.

**Voting:** Matters requiring the approval of the DIP Lenders, including amendments and waivers of the definitive credit documentation, will require the approval of the DIP Lenders holding, in the aggregate, greater than 50% of the outstanding loan exposure (balances and commitments) under the DIP Facility, subject to exceptions to be set forth in the definitive credit documentation.

## III.    Other Terms

**Conditions Precedent:** The closing and the making of any Interim Advance shall be subject to various conditions precedent customary for DIP loan transactions and investments of a similar size and nature consistent with the Prepetition Credit Agreement, including but not limited to:

1.    Satisfactory completion of legal and collateral due diligence and transaction structuring, including due diligence concerning the Borrowers' bankruptcy process and the receipt of all required court approvals for the DIP Facility;

2.    Execution of definitive agreements, instruments, and documents related to the DIP Facility (including, without limitation, the DIP Orders), each satisfactory in form and substance to the DIP Lenders in their sole and absolute discretion, including a satisfactory cash management system consistent with the existing cash management system and subject to the existing tri-party account control agreements;

3.    Delivery of the DIP Budget approved by the DIP Lenders and to be attached to the Interim Order and the Final Order entered by the Bankruptcy Court;

4.    Entry of the Final Order or Interim Order, as the case may be, by the Bankruptcy Court, after notice given and a hearing conducted in accordance with Rule 4001(c) of the Federal Rules of Bankruptcy Procedure (and any applicable local bankruptcy rules), authorizing and approving the transactions contemplated by the documents evidencing the DIP Facility and finding that the DIP Lenders are extending credit to the Borrowers in good faith within the meaning of Bankruptcy Code section 364(e) and containing the terms provided in the Section entitled "DIP Orders" herein;

5.    All of the "first day orders" shall have been entered at the commencement of the Borrowers' Chapter 11 Cases and shall be in form and substance reasonably satisfactory to the DIP Agent and the DIP Lenders.

6.    Reimbursement in full in cash of the fees, costs and expenses of the DIP Agent, the DIP Lenders and the Prepetition Agent; and

7.    No litigation commenced which has not been stayed by the

Bankruptcy Court and which, if successful, would have a material adverse impact on any Borrower, its business or ability to repay the DIP Facility, or which would challenge the transactions under consideration.

8. PEI and the Borrowers will enter into an Asset Management Agreement (the "Asset Management Agreement") in a form acceptable to the DIP Agent.

The documents evidencing the DIP Facility shall contain the following conditions precedent to each Advance (collectively, "Extensions of Credit"):

(i) No Default or Event of Default shall have occurred and be continuing;

(ii) Representations and warranties shall be true and correct as of the date of each Extension of Credit;

(iii) (A) The Interim Order shall be in full force and effect or (B) if (x) the date of such requested Extension of Credit is more than 45 days after the Closing Date or (y) the amount of such requested Extension of Credit, together with the amount of all Extensions of Credit then outstanding, shall exceed the maximum amount authorized pursuant to the Interim Order, the Final Order shall have been entered, which Final Order shall be in form and substance satisfactory to the DIP Agent and the DIP Lenders, and shall be in full force and effect and shall not have been appealed, stayed, reversed, vacated or otherwise modified in a manner adverse to the DIP Agent and the DIP Lenders;

(iv) Receipt by the DIP Agent and the DIP Lenders of a borrowing request in the form to be set out in the documents evidencing the DIP Facility executed by each Borrower. The Borrowers' request for each Extension of Credit shall constitute a representation and warranty that the conditions to the making of such Extension of Credit shall have been satisfied; and

(v) Payment of all fees and other amounts then due and payable.

**DIP Orders:** The DIP Orders shall be in form and substance reasonably acceptable in all respects to DIP Agent and DIP Lenders and to include, without limitation, provisions (i) approving in all respects the definitive documentation evidencing the DIP Facility, and authorizing and directing the Borrowers to execute and become bound by such definitive documentation; (ii) modifying the automatic stay to the extent necessary to permit or effectuate the terms of the DIP Orders and documents evidencing the DIP Facility, including, without limitation, to permit the creation and perfection of the DIP Agent's liens on the DIP Collateral; (iii) providing for the automatic relief of such stay to permit the enforcement of DIP Agent's and the DIP Lenders' remedies under the DIP Facility, subject to the right of the Borrowers and/or the Committee to re-impose or continue the automatic stay; and (iv) providing that the Borrowers acknowledge (a) the validity and enforceability of the

Prepetition Obligations, without defense, offset or counterclaim of any kind, (b) the validity, perfection and priority of the liens securing the Prepetition Obligations, and that the Borrowers waive any right to challenge or contest such claims and liens and (c) that they have no valid claims or causes of action, whether based in contract, tort or otherwise against the Prepetition Agent or any Prepetition Lender with respect to the Prepetition Credit Agreement or the related documents or transactions.

**Expenses:**

All reasonable out-of-pocket fees, costs and expenses of the DIP Agent, the DIP Lenders, the Prepetition Agent and the Prepetition Lenders (including, without limitation, reasonable out-of-pocket prepetition and postpetition fees, costs, expenses and disbursements of legal counsel, financial advisors and third-party appraisers, advisors and consultants advising the DIP Agent, the DIP Lenders, the Prepetition Agent and the Prepetition Lenders) to be payable by the Borrowers under the DIP Facility on demand whether or not the transactions contemplated hereby are consummated; provided, however, the Borrowers shall only be required to pay to the Prepetition Agent and the Prepetition Lenders such amounts that have accrued and are outstanding on or prior to the Petition Date, except as otherwise permitted in the Interim Order.

**Termination:**

Upon the occurrence of an Event of Default, the DIP Lenders may terminate the DIP Commitments, declare the DIP Obligations to be immediately due and payable and exercise all rights and remedies under the documents evidencing the DIP Facility and the DIP Orders, as applicable.

**Indemnification:**

Borrowers shall agree to indemnify and hold harmless the DIP Agent and the DIP Lenders and each of their respective affiliates and each of their respective officers, directors, employees, agents, advisors and representatives (each, an "Indemnified Party") from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, fees and disbursements of counsel), that may be incurred by or asserted or awarded against any Indemnified Party (including, without limitation, in connection with any investigation, litigation or proceeding or the preparation of a defense in connection therewith), arising out of or in connection with or by reason of the transactions contemplated hereby, except to the extent arising from an Indemnified Party's gross negligence or willful misconduct. In the case of an investigation, litigation or other proceeding to which the indemnity in this paragraph applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by any of the Borrowers, any of their respective directors, security holders or creditors, an Indemnified Party or any other person or an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated.

**Confidentiality:**

Except as required by law or in connection with the implementation of this Term Sheet, the terms hereof will be kept strictly confidential by each of the Borrowers and may only be disclosed to such Borrower's affiliates, legal counsel, financial advisors, financing sources and consultants who have been informed of, and agree to abide by, the confidentiality of this

14

Term Sheet. To the extent that any disclosure becomes legally required, the DIP Agent and the DIP Lenders shall be notified promptly and before the required disclosure is made.

**Governing Law:** New York law except as governed by the Bankruptcy Code.

**Miscellaneous:** This summary of terms and conditions does not purport to summarize all of the conditions, covenants, representations, warranties and other provisions which would be contained in definitive credit documentation for the DIP Facility contemplated hereby, all of which shall be acceptable to the DIP Agent and the DIP Lenders.

## ANNEX I

**Commitments**

| REVOLVING LENDER | REVOLVING LOAN COMMITMENT | ROLL UP LOAN COMMITMENT |
|---|---|---|
| WestLB AG, New York Branch | $1,485,606.38 | $2,228,409.53 |
| Amarillo National Bank | $805,589.60 | $1,208,384.41 |
| CIFC Funding 2007-III Ltd.; CIFC Funding 2007-IV, Ltd. | $1,044,473.15 | $1,566,709.73 |
| CIT Capital USA Inc. | $3,300,137.73 | $4,950,206.60 |
| Credit Suisse Candlewood Special Situations Master Fund, Ltd. | $4,864,148.59 | $7,296,222.89 |
| Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A., "Rabobank Nederland," New York Branch | $1,989,529.19 | $2,984,293.78 |
| Metropolitan Life Insurance Company | $1,701,944.26 | $2,552,916.40 |
| Norddeutsche Landesbank Girozentrale New York Branch and/or Cayman Island Branch | $1,871,279,73 | $2,806,919.60 |
| GreenStone Farm Credit Services, ACA/FLCA | $547,061.33 | $820,591.99 |
| Nordkap Bank AG | $1,588,972.09 | $2,383,458.14 |
| Northwest Farm Credit Services, FLCA | $547,061.33 | $820,591.99 |
| ShoreBank Pacific | $254,196.62 | $381,294.94 |
| **Total** | **$20,000,000.00** | **$30,000,000.00** |

# SCHEDULE B

## DIP Budget

Pacific Ethanol Holdco
Debtor In Possession Financing Budget
May 14, 2009

| | MAY | | JUNE | | | | | JULY | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Filing week 1 05/18-05/22 | week 2 05/26-05/29 | week 3 06/01-06/05 | week 4 06/08-06/12 | week 5 06/15-06/19 | week 6 06/22-06/26 | week 7 06/29-07/03 | week 8 07/06-07/10 | week 9 07/13-07/17 | week 10 07/20-07/24 | week 11 07/27-07/31 |
| **Beginning Cash Balance** | $ 2,235 | $ 500,000 | $ 500,000 | $ 500,000 | $ 500,000 | $ 500,000 | $ 1,134,664 | $ 500,000 | $ 500,000 | $ 1,257,037 | $ 500,000 |
| **Cash Inflows** | | | | | | | | | | | |
| Revenue - Ethanol (Kinergy) | 449,709 | 949,709 | 949,709 | 1,202,965 | 1,202,965 | 1,202,965 | 1,202,965 | 1,202,965 | 1,202,965 | 1,202,965 | 1,202,965 |
| Revenue - WDG (PAP) | 324,745 | 324,745 | 392,569 | 392,569 | 392,569 | 392,569 | 392,569 | 392,569 | 392,569 | 392,569 | 392,569 |
| **Total Cash Inflows** | 774,454 | 1,274,454 | 1,342,278 | 1,595,534 | 1,595,534 | 1,595,534 | 1,595,534 | 1,595,534 | 1,595,534 | 1,595,534 | 1,595,534 |
| **Disbursements** | | | | | | | | | | | |
| **Operating Disbursements** | | | | | | | | | | | |
| Corn | (2,081,000) | (1,919,700) | - | (1,919,700) | (1,919,700) | - | (1,896,000) | (1,896,000) | - | (1,896,000) | (1,896,000) |
| Natural Gas | | (183,144) | - | - | - | (145,145) | - | - | - | (163,560) | (15,730) |
| Lease Payments | | (106,470) | - | - | - | - | (17,745) | - | - | - | (17,745) |
| Insurance | | - | (100,000) | - | - | - | - | - | - | - | - |
| Property Tax | | - | (658,329) | - | - | - | - | - | - | - | - |
| Electricity | (18,000) | (127,294) | - | - | (18,000) | (12,000) | (89,706) | - | - | (27,000) | (112,294) |
| Ethanol freight | (24,528) | (24,528) | (31,068) | (31,068) | (31,068) | (31,068) | (31,068) | (31,068) | (31,068) | (31,068) | (31,068) |
| Co-product freight | (49,639) | (49,639) | (62,877) | (62,877) | (62,877) | (62,877) | (62,877) | (62,877) | (62,877) | (62,877) | (62,877) |
| Grain procurement and handling w/ PAP | | (47,972) | - | - | - | - | (60,765) | - | - | - | (60,765) |
| One time shutdown costs | (59,325) | (59,325) | (59,325) | (59,325) | (59,325) | (59,325) | (59,325) | (20,663) | - | - | - |
| Plant Supplies & Maintenance | (216,653) | (223,881) | (215,041) | (215,041) | (215,241) | (218,719) | (218,791) | (209,997) | (210,865) | (214,743) | (214,615) |
| **Total Operating Disbursements** | (2,449,145) | (2,741,953) | (1,216,641) | (2,288,011) | (2,306,211) | (529,135) | (2,438,277) | (2,220,605) | (304,810) | (2,395,347) | (2,411,094) |
| **Asset Management Agreement** | | | | | | | | | | | |
| Direct Reimbursement | (186,133) | - | (199,243) | - | (173,082) | - | (131,351) | (26,180) | (173,861) | - | (173,861) |
| Payroll & Benefits - Plants & Plant Operations | | - | (101,990) | - | - | - | - | (101,990) | - | - | - |
| Leases | | - | (31,300) | - | - | - | - | (31,300) | - | - | - |
| Other Direct Expenses | (8,300) | (1,020,000) | - | | | | | | | | |
| Bankrupcy Preparation Fees | | | (195,000) | - | - | - | - | (195,000) | - | - | - |
| Asset Management Fee | (97,500) | - | - | - | - | - | - | - | - | - | - |
| **Total Asset Management Agreement** | (291,933) | (1,020,000) | (527,533) | - | (173,082) | - | (131,351) | (354,451) | (173,861) | - | (173,861) |
| **Disbursements Related to Prepetition Debts - First Day Motions** | | | | | | | | | | | |
| Goods Sold in Last 20 Days | (118,569) | - | - | - | - | - | - | - | - | - | - |
| Shippers & Warehouseman | (98,500) | - | - | - | - | - | - | - | - | - | - |
| Prepetition Priority Taxes | (382,147) | - | - | - | - | - | - | - | - | - | - |
| Utility Deposit | - | (892,644) | - | - | - | - | - | - | - | - | - |
| **Total Disbursements Related to Prepetition Debts** | (599,216) | (892,644) | - | - | - | - | - | - | - | - | - |
| **Professional Fees & Administrative Expenses** | | | | | | | | | | | |
| Legal Advisors - Debtor | (93,750) | (93,750) | (82,500) | (82,500) | (82,500) | (82,500) | (82,500) | (107,500) | (107,500) | (107,500) | (107,500) |
| Legal Advisors - DIP Lenders | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) |
| Financial Advisor Debtor | (75,000) | (75,000) | (75,000) | (75,000) | (75,000) | (75,000) | (75,000) | (100,000) | (100,000) | (100,000) | (100,000) |
| Financial Advisors - DIP Lenders | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) |
| Creditors Committee Legal & Financial Advisors | (52,326) | (52,326) | (52,326) | (52,326) | (52,326) | (52,326) | (52,326) | (52,326) | (52,326) | (52,326) | (52,326) |
| Claims Agent | (50,000) | - | (50,000) | - | - | - | - | - | - | - | (50,000) |
| Trustee Fees | | | | | | | | | | | (30,000) |
| **Total Professional Fees & Administrative Expenses** | (371,076) | (321,076) | (359,826) | (309,826) | (309,826) | (309,826) | (309,826) | (359,826) | (359,826) | (359,826) | (439,826) |
| DIP Interest & Fees | (600,000) | (52,490) | - | - | - | (121,909) | - | - | - | - | (151,796) |
| **Total Disbursements** | (4,311,369) | (4,828,162) | (2,103,999) | (2,597,837) | (2,789,119) | (960,869) | (2,877,453) | (2,934,881) | (838,497) | (2,755,173) | (3,176,576) |
| DIP Funding | 4,034,680 | 3,553,709 | 761,721 | 1,032,303 | 1,193,586 | - | 647,255 | 1,339,348 | - | 402,603 | 1,581,043 |
| **Ending Cash Balance** | $ 500,000 | $ 500,000 | $ 500,000 | $ 500,000 | $ 500,000 | $ 1,134,664 | $ 500,000 | $ 500,000 | $ 1,257,037 | $ 500,000 | $ 500,000 |

Draft - Subject to Review

**Pacific Ethanol Holdco**
**Debtor in Possession Financing Budget**
**May 14, 2009**

| | AUGUST | | | | | SEPTEMBER | | | | | OCTOBER | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | week 12 7/26-8/1 | week 13 8/2-8/8 | week 14 8/9-8/15 | week 15 8/16-8/22 | week 16 8/23-8/29 | week 17 8/30-9/5 | week 18 9/6-9/12 | week 19 9/13-9/19 | week 20 9/20-9/26 | week 21 9/27-10/3 | week 22 10/4-10/10 | week 23 10/11-10/17 | week 24 10/18-10/24 |
| Beginning Cash Balance | $ 500,000 | $ 1,131,503 | $ 500,000 | $ 500,000 | $ 820,036 | $ 500,000 | $ 500,000 | $ 758,233 | $ 1,312,623 | $ 1,934,069 | $ 1,504,772 | $ 1,034,428 | $ 500,000 |
| **Cash Inflows** | | | | | | | | | | | | | |
| Revenue – Ethanol (Kinergy) | 1,202,865 | 1,202,865 | 1,293,188 | 1,293,188 | 1,202,865 | 1,202,865 | 1,202,865 | 1,202,865 | 1,202,865 | 1,202,865 | | | |
| Revenue – WDG (PAP) | 392,569 | 392,569 | 392,569 | 392,569 | 392,569 | 392,569 | 392,569 | 392,569 | 392,569 | 392,569 | | | |
| Total Cash Inflows | 1,595,534 | 1,595,534 | 1,685,756 | 1,685,756 | 1,595,534 | 1,595,534 | 1,595,534 | 1,595,534 | 1,595,534 | 2,248,405 | | | |
| **Disbursements** | | | | | | | | | | | | | |
| **Operating Disbursements** | | | | | | | | | | | | | |
| Corn | (1,896,000) | (1,919,700) | | | (1,919,700) | (1,916,700) | (733,000) | | | | | (179,390) | (179,390) |
| Natural Gas | | | | (179,390) (17,145) | | | | (179,390) (1,494) | (16,251) | | | | (17,145) |
| Lease Payments | | | | | | | | | | | | | |
| Insurance | | | | | | | | | | (112,294) | (370,000) | | |
| Property Tax | | | | | | | | | | (50,589) | | | |
| Electricity | (31,068) | (33,398) | (15,000) (33,398) | (124,244) (33,398) | (31,068) | (31,068) | (31,068) | (31,068) | (31,068) | (50,589) | | | (124,784) |
| Ethanol freight | (62,877) | (62,877) | (62,877) | (62,877) | (62,877) | (62,877) | (62,877) | (62,877) | (62,877) | (60,765) | | | |
| Co-product freight | | | | (60,765) | | | | | (60,765) | | | | |
| Grain procurement and handling w/ PAP | | | | | | | | | | | | | |
| One time shutdown costs | | | | | | | | | | | (1,800,000) | | |
| Plant Supplies & Maintenance | (205,819) | (206,210) | | (213,439) | (204,530) | (204,530) | (208,468) | (208,236) | (518,534) | (17,442) | (17,442) | (17,442) | (17,442) |
| Total Operating Disbursements | (209,755) | (2,198,285) | (2,237,185) | (691,937) | (2,218,175) | (2,218,175) | (1,027,475) | (208,236) | (518,534) | (143,077) (160,519) | (1,780,519) | (143,077) (160,849) | (143,077) (160,849) |
| **Asset Management Agreement** | | | | | | | | | | | | | |
| Direct Reimbursement | (26,160) | (173,082) | (173,082) | (179,390) (17,145) | (26,160) | (173,082) | (173,082) | (173,082) | 78,481 | (279,082) | (17,442) | (17,442) | (179,390) (17,145) |
| Benefits & Benefits – Plants & Plant Operations | (101,990) | | | | (101,990) | | | | | (101,990) | | | |
| Leases | (31,100) | | | | (31,100) | | | | | (31,100) | | | |
| Other Direct Expenses | | | | | | | | | | | (15,000) | | (15,000) |
| Bankruptcy Preparation Fees | | | | | | | | | 78,481 | | | | |
| Asset Management Fee | (155,000) | | | (155,000) | (155,000) | | | | | (155,000) | | | |
| Total Asset Management Agreement | (354,451) | (173,082) | (173,082) | (354,451) | (354,451) | (173,082) | (173,082) | (173,082) | 78,481 | (607,359) | (252,907) | | |
| **Disbursements Related to Prepetition Debts – First Day** | | | | | | | | | | | | | |
| Shippers & Warehousemen | | | | | | | | | | | | | |
| Prepetition Priority Taxes | | | | | | | | | | | | | |
| Utility Deposit | | | | | | | | | | | | | |
| Total Disbursements Related to Prepetition Debts | | | | | | | | | | | | | |
| **Professional Fees & Administrative Expenses** | | | | | | | | | | | | | |
| Legal Advisors – Debtor | (82,500) | (82,500) | (82,500) | (82,500) | (82,500) | (82,500) | (82,500) | (82,500) | (82,500) | (82,500) | (82,500) | (82,500) | (82,500) |
| Legal Advisors – DIP Lenders | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) |
| Financial Advisors – DIP Lenders | (75,000) | (75,000) | (75,000) | (75,000) | (75,000) | (75,000) | (75,000) | (75,000) | (75,000) | (75,000) | (75,000) | (75,000) | (75,000) |
| Financial Advisors – DIP Lenders | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) |
| Creditors Committee Legal & Financial Advisors | (52,326) | (52,326) | (52,326) | (52,326) | (52,326) | (52,326) | (52,326) | (52,326) | (52,326) | (52,326) | (52,326) | (52,326) | (52,326) |
| Claims Agent | | | | | | | | | | | | | |
| Trustee Fees | | | | | | | | (20,000) | | | | | |
| Total Professional Fees & Administrative Expenses | (309,826) | (309,826) | (309,826) | (309,826) | (309,826) | (309,826) | (309,826) | (329,826) | (309,826) | (309,826) | (309,826) | (309,826) | (309,826) |
| **Total Disbursements** | (864,031) | (2,681,193) | (2,547,071) | (1,356,718) | (2,882,451) | (2,701,083) | (1,337,330) | (1,041,144) | (974,087) | (2,677,702) | (2,677,702) | (470,345) | (738,432) |
| DIP Interest & Fees | | | | (181,603) | | | | | (204,205) | | | | (210,875) |
| DIP Funding | | 881,255 | 829,036 | | 867,656 | 1,105,548 | | 1,934,069 | | 1,504,772 | | 204,624 | 1,380,576 |
| **Ending Cash Balance** | $ 1,131,503 | $ 500,000 | $ 500,000 | $ 820,036 | $ 500,000 | $ 500,000 | $ 758,233 | $ 1,312,623 | $ 1,934,069 | $ 1,504,772 | $ 1,034,428 | $ 500,000 | $ 500,000 |

Draft - Subject to Review

**EXHIBIT B**

**DIP Credit Agreement**

**To Be Filed**