# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

In re: ) Case No.
)
PACIFIC ETHANOL HOLDING CO. LLC, ) Chapter 11
et al., ) Joint Administration Pending
)
Debtors.[1] )

## DECLARATION OF CHRISTOPHER W. WRIGHT
## IN SUPPORT OF FIRST DAY PLEADINGS

I, Christopher W. Wright, being duly sworn, depose and say:

1. I am the Vice President and Secretary of Pacific Ethanol Holding Co. LLC, ("PE HoldCo"), a Delaware limited liability company with its corporate offices located at 400 Capitol Mall, Suite 2060, Sacramento, CA 95814, and of each of the other debtors and debtors-in-possession in the above-captioned chapter 11 cases (collectively, the "Debtors"). I am authorized to submit this declaration (the "Declaration") on behalf of the Debtors. As a result of my tenure with the Debtors, my review of relevant documents, my discussions with other members of the Debtors' management teams, and my duties as general counsel, I am familiar with the Debtors' day-to-day operations, business affairs, and books and records. Except as otherwise noted, I have personal knowledge of the matters set forth herein and, if called as a witness, would testify competently thereto.

2. To enable the Debtors to minimize the adverse effects of these Chapter 11 Cases (as defined below) on their business and assets, the Debtors request various types of relief

---

[1] The Debtors consist of: Pacific Ethanol Holding Co. LLC (EIN: XX-XXX6981); Pacific Ethanol Madera LLC (EIN: XX-XXX3339); Pacific Ethanol Columbia, LLC (EIN: XX-XXX9392); Pacific Ethanol Stockton LLC (EIN: XX-XXX8349); Pacific Ethanol Magic Valley, LLC (EIN: XX-XXX7391). Pacific Ethanol Holding Co. LLC is the sole member of each of the other Debtors. The mailing address for Pacific Ethanol Holding Co. LLC is 400 Capitol Mall, Suite 2060, Sacramento, CA 95814.

PAC/916534
1

in "first day" applications and motions (collectively, the "First Day Motions"). I submit this Declaration in support of the Debtors' First Day Motions.[2] Except as otherwise stated, all facts set forth in this Declaration are based on my personal knowledge, my discussions with other members of the Debtors' senior management, managers, and members, my review of relevant documents, or my opinion, based on my experience and knowledge of the Debtors' operations and financial conditions.

3. Part I of this Declaration describes the Debtors' businesses and the circumstances surrounding the commencement of their Chapter 11 Cases. Part II of this Declaration sets forth the relevant facts in support of the Debtors' postpetition financing facility (the "DIP Facility"). Finally, Part III of this Declaration sets forth the relevant facts in support of the First Day Motions filed concurrently herewith.

## I.  BACKGROUND

### The Chapter 11 Filing

4. On the date hereof (the "Petition Date"), the Debtors each commenced a case by filing a petition for relief under Chapter 11 of the Title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code. The Debtors have requested that these chapter 11 cases (the "Chapter 11 Cases") be jointly administered.

5. No creditors' committee has been appointed in these Chapter 11 Cases by the Office of the United States Trustee. No trustee or examiner has been appointed in any of the Debtors' Chapter 11 Cases.

---

[2] Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the relevant First Day Motion.

PAC/916534

2

6. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

**Company Operations**

7. The Debtors consist of four limited liability companies, each of whom owns an ethanol plant (each a "Plant LLC" and collectively, the "Plant LLCs") with current combined ethanol production capacity of over 200 million gallons per year ("MGY"), and PE HoldCo as owner/holding company for the Plant LLCs. Two of the ethanol plants are located in California, one is located in Idaho and one is located in Oregon. Due to economic and financial constraints, only the ethanol plant located in Oregon is operating at the present time. Prior to the filing of the Chapter 11 Cases, the Debtors were the production facilities for Pacific Ethanol, Inc. ("PEI") a public company, and its subsidiaries (collectively the "PEI Group"). As part of the PEI Group, the Plant LLCs were managed by PEI and the ethanol and its co-products, including wet distillers grain ("WDG"), produced at the ethanol plants were marketed and sold to customers[3] primarily in California, Nevada, Arizona, Oregon, Colorado, Idaho and Washington by PEI Group affiliates under arms-length commercial contracts as more fully described below. The ethanol plants were built at their locations as part of a destination business model, whereby each respective ethanol plant achieves lower process and transportation costs by servicing local markets for both ethanol and WDG. The ethanol plants are as follows:

- **Madera Plant**--located in Madera, California, commenced operations in October 2006 and has an annual production capacity of up to 40 MGY.

---

[3] The ethanol is sold to gasoline refining and distribution companies, while the WDG is sold to dairy farm operators and animal feed distributors for consumption by farm animals, including dairy cows and beef cattle.

PAC/916534

3

- **Boardman Plant**--located in Boardman, Oregon, commenced operation in September 2007 and has an annual production capacity of up to 40 MGY.

- **Magic Valley Plant**--located in Burley, Idaho, (Magic Valley) commenced operations in April 2008 and has an annual production capacity of up to 60 MGY.

- **Stockton Plant**--located in Stockton, California, commenced operations in September 2008 and has an annual production capacity of 60 MGY.

8.  As indicated above, at the present time only the Boardman Plant is in operation. The Madera, Magic Valley and Stockton Plants are in "cold shut down" with no current business operations.

**Prepetition Capital Structure**

9.  As of the Petition Date, the aggregate principal amount of the Debtors' secured indebtedness was approximately $247,307,091 plus accrued and unpaid interest, fees and other costs and consisted of, among other things, construction/project financing, term loans, a revolving loan facility and a note payable. Each of the Debtors are parties to a certain Credit Agreement, dated as of February 27, 2007 (as amended, restated, supplemented or otherwise modified, the "Credit Agreement"), by and among the Debtors, WestLB AG, New York Branch, as administrative agent and collateral agent ("WestLB") and the syndicate lender parties thereto (the "WestLB Facility").

10.  The Credit Agreement provides for (i) a construction loan facility in an aggregate amount of up to $247,307,692 which converted into a term loan facility comprised of two tranches: (a) Tranche A (approximately $86,187,500 in principal amount outstanding as of the Petition Date) and (b) Tranche B (approximately $141,120,192 in principal amount outstanding as of the Petition Date); (ii) a working capital facility (approximately $19,174,561 in

principal amount outstanding as of the Petition Date); and (iii) letters of credit (approximately $825,439 outstanding as of the Petition Date). The primary purpose of the WestLB Facility is to provide debt financing in connection with the development, construction, installation, engineering, procurement, design, testing, start-up, operation and maintenance of the Debtors' Plants. The WestLB Facility is secured by substantially all of the assets of the Debtors, a pledge of the equity interests in each of the Debtors, and a support arrangement from PEI.

11. On February 17, 2009, the Debtors entered into that certain Limited Waiver and Forbearance Agreement dated February 17, 2009 (the "First Waiver and Forbearance Agreement"). Among other things, the First Waiver and Forbearance Agreement permitted the Debtors to withdraw the funds otherwise required to be reserved in the Stockton Construction Account (as defined therein) and to use those funds in accordance with the Initial 13-Week Cash Flow Forecast (as defined therein). The First Waiver and Forbearance Agreement also provided that WestLB and the senior secured lenders would forbear from exercising their rights and remedies under the Credit Agreement on the terms and conditions set forth in the First Waiver and Forbearance Agreement.

12. On February 27, 2009, the Debtors entered into a Second Limited Waiver and Forbearance Agreement (the "Second Waiver and Forbearance Agreement"). Among other things, the Second Waiver and Forbearance Agreement provides that WestLB and the senior secured lenders will further forbear from exercising their rights and remedies under the Credit Agreement and related documents and applicable law, on the terms and conditions set forth in the Second Waiver and Forbearance Agreement, for a period of time commencing on February 27, 2009 and ending on the earliest to occur of (i) March 31, 2009, (ii) the date that any new default occurs under the Credit Agreement or a default occurs under the Second Waiver and

Forbearance Agreement, and (iii) the date on which all obligations have been paid in full and the Credit Agreement has been terminated. Additionally, the Second Waiver and Forbearance Agreement provides that the Debtors will not be required to make their interest payments due and payable on February 27, 2009 until the termination of the Forbearance Period. Further, the Second Waiver and Forbearance Agreement provides that Debtors may withdraw funds otherwise required to be maintained in a debt service reserve account and use such funds in accordance with an agreed-upon 13-week cash flow forecast.

13. On March 31, 2009, the Debtors entered into a Third Forbearance Agreement (the "Third Forbearance Agreement"). Among other things, the Third Forbearance Agreement provides that WestLB and the senior secured lenders will further forbear from exercising their rights and remedies under the Credit Agreement and related documents and applicable law, on the terms and conditions set forth in the Third Forbearance Agreement, for a period of time commencing on March 31, 2009 and ending on the earliest to occur of (i) April 30, 2009, (ii) the date that any new default occurs under the Credit Agreement or a default occurs under the Third Forbearance Agreement, and (iii) the date on which all obligations have been paid in full and the Credit Agreement has been terminated.

**Intercompany Structure & Operations**

14. Each of the Debtors is managed by PEI,[4] pursuant to an Asset Management Agreement entered into on May 14, 2009 (the "Management Agreement"). Under the Management Agreement, PEI is retained by each Plant LLC as an independent contractor to (i) preserve in cold shut down the Madera, Magic Valley, and Stockton Plants and (ii) operate and maintain the Boardman Plant; in each case as more specifically described in the

---

[4] PEI owns 100% of the equity interests of Pacific Ethanol California, Inc. ("PECA"). PECA is the sole member of PE HoldCo.

Management Agreement. In addition, under the Management Agreement, PEI disburses funds for the payrolls for the Plant LLCs and is reimbursed by the Plant LLCs. Under the Management Agreement, PEI also provides all management and administrative services for the Plant LLCs and PE HoldCo.

**Kinergy Marketing LLC**

15. Each Plant LLC is a party to a written marketing agreement with Kinergy Marketing LLC ("Kinergy"),[5] whereby, each Plant LLC grants Kinergy the exclusive right to market, purchase and sell the Plant LLC's ethanol (the "Kinergy Marketing Agreement"). Pursuant to the terms of the Kinergy Marketing Agreement, within ten days after a Plant LLC delivers ethanol to Kinergy, that Plant LLC is paid an amount equal to the (i) estimated purchase price; minus (ii) the estimated amount of transportation costs; minus (iii) the estimated amount of the applicable incentive fee (incentive fee is one percent (1%) of the aggregate purchase price). In connection with each such payment, Kinergy delivers to the respective Plant LLC a statement detailing its estimated calculations and within the first five business days of each calendar month the parties reconcile and "true-up" the actual purchase price, transportation costs and incentive fees for all transactions entered into since the previous payment adjustment date. The amount of such true-up is paid by the party owing such amount within five (5) business days after the reconciliation.

**Pacific Ag. Products, LLC**

16. Pacific Ag. Products, LLC ("Pacific Ag"),[6] procures all of the corn feedstock for the Plant LLCs. Pacific Ag has sourced corn from over thirty 30 loading origins in the western and central corn belt for delivery to destination ethanol facilities. In addition to

---

[5] Kinergy's sole member is PEI.
[6] Pacific Ag's sole member is PECA.

entering into purchase contracts for the corn on behalf of the Plant LLCs, Pacific Ag coordinates unit train logistics with the Plant LLCs to help ensure proper inventory levels and timely delivery. Pacific Ag earns a procurement and handling fee from PE HoldCo.

17. Pacific Ag also markets WDG and syrup co-products from the Plant LLCs, manages all scheduling and logistics of WDG and syrup truckloads, invoices customers, and handles all credit and collections issues on behalf of the Plant LLCs. Within ten (10) days after a Plant LLC delivers WDG and/or syrup co-products to Pacific Ag, that Plant LLC is paid an amount equal to: (i) the estimated purchase price; minus (ii) the estimated amount of transportation costs; minus (iii) the estimated amount of the applicable incentive fee (the incentive fee is the greater of (x) the product of five percent (5%) multiplied by the aggregate amount of the purchase price and (y) the product of two dollars ($2.00) multiplied by each ton sold in such transaction). In connection with each such payment, Pacific Ag delivers to the Plant LLC a statement detailing its estimated calculations and within the first five business days of each calendar month the parties reconcile and "true-up" the actual purchase price, transportation costs and incentive fees for all transactions entered into since the previous payment adjustment date. The amount of such true-up is paid by the party owing such amount within five (5) business days after the reconciliation.

18. With the exception of the procurement and marketing fees mentioned above, substantially all of Pacific Ag's gross billings for co-products are paid out to the Plant LLCs on 10 day and 30 day terms, respectively. Pacific Ag offers 30 day terms to qualified customers and typically collects receivables from the end customer in 40 to 45 days.

### Events Leading to a Chapter 11 Filing

19. The Debtors' liquidity is materially affected by uncertain commodity prices for corn, natural gas and ethanol. Corn and ethanol prices have been highly volatile, do not necessarily move in the same direction (i.e., high corn prices do not necessarily result in high ethanol prices) and are impacted by a number of factors beyond the Debtors' control. Ethanol prices are generally influenced by the supply and demand for gasoline, the availability of substitutes and the effect of related laws and regulations. By contrast, corn prices are not significantly related to gasoline supply and demand; rather the availability and price of corn are subject to wide fluctuations due to unpredictable factors such as weather conditions during the corn growing season, crop yields, governmental policy with respect to agriculture and international supply and demand. Additionally, the Debtors are also impacted by other major costs including natural gas, transportation, and the purchase price of ethanol from other producers, which in turn are also highly volatile and difficult to forecast. During the latter part of 2008, the price of ethanol declined precipitously causing the Debtors' gross margins to decrease. In addition to decreasing margins, operating costs increased as a result of the construction of three additional ethanol plants in 2007 and 2008.

20. Ultimately, sizeable fluctuations in the price of corn, natural gas and ethanol, coupled with obligations to service the Debtors' debt in the face of a continued lack of liquidity in the credit markets since 2007 and the inability to raise additional investment capital from depressed equity markets, have precipitated these Chapter 11 Cases.

### II. DEBTORS' PROPOSED POSTPETITION FINANCING

### Immediate Need for Postpetition Financing

21. The Debtors lack sufficient unencumbered funds with which to preserve, operate and maintain their businesses and assets during the pendency of these Chapter 11 Cases.

The Debtors' ability to pay critical preservation, administrative, and operating expenses is essential to the Debtors' ability to survive and maintain their asset values. Accordingly, the Debtors have an immediate need for debtor-in-possession financing and the use of cash collateral.

**Background of the DIP Facility**

22. To provide the Debtors with the funding necessary to fulfill their administrative and operational obligations throughout the duration of the Chapter 11 Cases, the Debtors require a postpetition lending facility. Thus, prior to the Petition Date, the Debtors and their advisors surveyed various sources of postpetition financing, including financing from WestLB, Lyles United, LLC and certain unrelated third parties, including Beal Bank/CSG Investments, Bank of America, Versa Capital, PNC Bank, Blackrock Kelso, Alladin Capital, and Fortress Investment Group.

23. In exploring their options, the Debtors recognized that the obligations owed to WestLB are secured by the plants and related prepetition collateral, and therefore (i) the liens of these prepetition secured creditors would have to be primed to obtain postpetition financing, (ii) the Debtors would have to find a postpetition lender willing to extend credit that would be junior to the liens of these prepetition secured creditors, or (iii) postpetition financing would have to be extended on an unsecured basis.

24. In the current economic environment, capital and other forms of financing are virtually non-existent. Various potential lenders advised the Debtors that they would not provide any debtor-in-possession financing. Another potential lender discussed financing but only if it was secured by liens priming those of WestLB on the plants and related assets. However, WestLB advised the Debtors' representatives that it would not consent to be primed by another lender group, therefore borrowing from another postpetition lender or lending group that required security senior to that of WestLB likely could only be accomplished through an

extended, contested hearing on whether the requirements of section 364(d) of the Bankruptcy Code had been satisfied. In addition, despite their efforts, the Debtors were unable to find a postpetition lender willing to extend credit that would be junior to the liens of WestLB or that would be extended on an unsecured basis. In view of these circumstances, WestLB and the other syndicate lenders party to the WestLB Facility (the "DIP Lenders") were willing to extend postpetition financing and thus prime their own prepetition security interests. Ultimately, the Debtors concluded that the debtor-in-possession credit agreement (the "DIP Credit Agreement")[7] proposed by the DIP Lenders is desirable because, among other things, the DIP Credit Agreement permits the Debtors to secure the postpetition financing required for their reorganization without having to prime the WestLB Facility through an extended, contested hearing.

25. Moreover, the DIP Lenders' proposal offers the most attractive combination of quality, pricing, fees, and covenant flexibility. Importantly, the DIP Credit Agreement provides that the Debtors may draw funds immediately (on an interim basis) to meet their administrative and operational obligations during these Chapter 11 Cases. Finally, because the DIP Lenders are comprised of certain of the parties to the WestLB Facility, they have a substantial base of knowledge with respect to the Debtors' business and assets that provide significant benefits, including, but not limited to, the speed with which they would be able to close the proposed postpetition financing. Consequently, the Debtors determined that the DIP

---

[7] For further details regarding the DIP Credit Agreement, see the Debtors' Motion for Entry of Orders (i) Authorizing the Debtors to (a) Obtain Postpetition Senior Secured Super-Priority Financing Pursuant to 11 U.S.C. §§105, 361, 362, 363(c), 363(e), 364(c), 364(d)(1), 364(e) and 507 and (b) Utilize Cash Collateral of Prepetition Lenders, (ii) Granting Adequate Protection to Prepetition Lenders Pursuant to 11 U.S.C. §§361, 362, 363 and 364, (iii) Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c), and (iv) Granting Related Relief, filed simultaneously herewith.

Lenders' proposed postpetition financing is the best financing option available under the circumstances.

26. The Debtors and the DIP Lenders engaged in vigorous and extensive, arms'-length negotiations with respect to the terms and conditions of the DIP Credit Agreement. Indeed, the Debtors estimate that over 50 hours were spent in face-to-face meetings and conference calls and hundreds of e-mails and other forms of communications were directed between the parties.

**Use of the DIP Financing**

27. Pursuant to the DIP Credit Agreement, the Debtors may use the proceeds of the postpetition financing to pay the transaction costs related to the closing of the DIP Credit Agreement and thereafter, to finance the Chapter 11 Cases and for other general corporate purposes pursuant to the debtor-in-possession budget to be attached to the proposed interim and final orders.

28. Each of the proposed uses of the postpetition financing confers a direct benefit upon the Debtors and their estates. Among other things, the postpetition financing allows the Debtors to finance the ordinary costs of their operations, maintain business relationships with vendors, suppliers and customers, make payroll, and satisfy other working capital and operational needs in accordance with the DIP Budget (as defined in the DIP Credit Agreement).

### III. FIRST DAY MOTIONS

29. Concurrently with the filing of these Chapter 11 Cases, the Debtors filed the First Day Motions and proposed orders and respectfully request that the Court consider entering the proposed orders granting the following First Day Motions:

a. Motion of the Debtors for Order Pursuant to Bankruptcy Rule 1015 and Local Rule 1015-1 Authorizing Joint Administration of the Debtors' Chapter 11 Cases;

b. Motion of Debtors for Order Pursuant to Bankruptcy Rule 1007(c) and Local Rule 1007-1(b) Extending Time for Filing of Schedules and Statements;

c. Motion for Entry of Orders (i) Authorizing the Debtors to (a) Obtain Postpetition Senior Secured Super-Priority Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(c), 363(e), 364(c), 364(d)(1), 364(e) and 507 and (b) Utilize Cash Collateral of Prepetition Lenders, (ii) Granting Adequate Protection to Prepetition Lenders Pursuant to 11 U.S.C. §§ 361, 362, 363 and 364, (iii) Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c), and (iv) Granting Related Relief;

d. Motion of the Debtors for Order Pursuant to Bankruptcy Code Sections 105(a), 363(b), 503(b), 506, 1107 and 1108 and Fed. R. Bankr. P. 6003 Authorizing Payment of Certain Prepetition Shipping, Delivery, and Warehousing Charges;

e. Motion of Debtors for Order Pursuant to Bankruptcy Code Sections 105(a) and 363 and Bankruptcy Rule 6003 Authorizing (i) Continued Use of Existing Cash Management System, (ii) Continued Use of Existing Bank Accounts, (iii) Authorizing Continued Use of Existing Business Forms, and (iv) Authorizing Intercompany Transactions;

f. Motion for Order Under 11 U.S.C. §§ 105(a) and 366 (i) Prohibiting Utility Companies from Altering or Discontinuing Service on Account of Prepetition Invoices, (ii) Approving Deposit as Adequate Assurance of Payment, and (iii) Establishing Procedures for Resolving Requests by Utility Companies for Additional Assurance of Payment;

g. Motion of the Debtors for Order Pursuant to Bankruptcy Code Sections 105(a), 506(a), 507(a)(8), 541 and 1129 and Fed. R. Bankr. P. 6003 Authorizing the Debtors to Pay Prepetition Taxes;

h. Motion for an Order Pursuant to 11 U.S.C. §§ 105 and 503(b) (i) Confirming Grant of Administrative Expense Status to Obligations Arising from Prepetition Delivery of Goods Received Within 20 Days of the Commencement Date of These Chapter 11 Cases, (ii) Confirming Grant of Administrative Expense Status to Obligations Arising from Postpetition Delivery of Goods and Services, and (iii) Authorizing, but not Directing, the Debtors to Pay Such Obligations in the Ordinary Course of Business; and

i. Application of Debtors for Order Pursuant to 28 U.S.C. § 156(c), Bankruptcy Rule 2002(f), and Local Rule 2002-1(1) Approving Agreement with Epiq Bankruptcy Solutions, LLC as Claims, Noticing, Soliciting, and Balloting Agent.

30. I have reviewed each of the First Day Motions and proposed orders (including the exhibits thereto) and I adopt and confirm the factual statements contained therein. I believe that the relief sought in each of the First Day Motions and proposed orders (a) is vital to enable the Debtors to make the transition to, and operate in, Chapter 11 with a minimum interruption or disruption to their businesses or loss of productivity or value and (b) constitutes a critical element in achieving the Debtors' successful reorganization.

## CONCLUSION

31. The Debtors' ultimate goal is to reorganize their financial affairs under the terms of a confirmed chapter 11 plan. In the near term, however, to minimize any loss of value of their business or asset values during their restructuring, the Debtors' immediate objective is to maintain a business-as-usual atmosphere during the pendency of these Chapter 11 Cases, with as little interruption or disruption to the Debtors' operations as possible. I believe that if the Court grants the relief requested in each of the First Day Motions, the prospect for achieving these objectives and completing a successful, rapid reorganization of the Debtors will be substantially enhanced.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 17th day of May, 2009.

By: _____
Christopher W. Wright
Vice President and Secretary of
Pacific Ethanol Holding Co. LLC